No objections to this Report and Recomendation (the "R&R") have been filed, and I therefore review it for clear error. Finding none, I adopt the R&R as the decision of the Court. The Commissioner's motion is GRANTED and Plaintiff's motion is DENIED. The case is hereby remanded to the Commissioner for further proceedings consistent

**UNITED STATES DISTRICT COURT** with the R&R and pursuant to sentence four of 42 USC 405(g).

**SOUTHERN DISTRICT OF NEW YORK**   The Clerk of Court is respectfully directed to terminate the pending motions (Docs. 22, 32) and remand the case.

ROBINSON EMILIO TAVAR

SO ORDERED.

Pl:

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

- *against* -

5/1/19

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY,

**Defendant.**

15CV5141 (CS)(LMS)

**REPORT AND
RECOMMENDATION**

TO:   **THE HONORABLE CATHY SEIBEL, U.S.D.J.**

Plaintiff Robinson Emilio Tavarez brings this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner"), which found that Plaintiff was not entitled to either disability insurance

benefits ("DIB") or supplemental security income ("SSI") under the Social Security Act (the

"Act"). ECF No. 1.[1] Each party has submitted a motion for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure. ECF Nos. 22, 32. For the reasons

discussed below, I conclude, and respectfully recommend that Your Honor should conclude that

the Commissioner's motion (ECF No. 22) be **GRANTED**, and Plaintiff's motion (ECF No. 32)

be **DENIED**, and the case be remanded to the Agency for further proceedings consistent with

this Report and Recommendation and pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] Citations to "ECF" refer to the electronic docket associated with this case.

# I.   BACKGROUND

## A.   Procedural History

On August 30, 2010, Plaintiff filed applications for DIB and SSI benefits, alleging June 21, 2010, as the onset date of his disability. AR 290-98, 299-306.[2]  His claims were denied on November 26, 2010.  AR 137-44.  Thereafter, Plaintiff requested an administrative hearing before an administrative law judge ("ALJ") (AR 145), and on September 7, 2011, a hearing was held before ALJ Eduardo Rodriguez-Quilichini.  AR 80-106.[3]  On October 4, 2011, ALJ Rodriguez-Quilichini issued an unfavorable decision.  AR 109-29.

Subsequently, on October 12, 2011, Plaintiff filed a request for review of the ALJ's October 4, 2011, decision with the Social Security Administration's (the "SSA" or "Agency") Appeals Council (AR 213-14), and on May 19, 2012, the Appeals Council remanded the case for additional proceedings.  AR 130-36.[4]  On September 4, 2012, a second administrative hearing was held before ALJ Seth Grossman.  AR 70-79.  At that hearing, ALJ Grossman stated that he was sending Plaintiff for a neurological examination and thereafter would hold a supplemental hearing with both an orthopedic medical examiner and a vocational expert present.  AR 77.  On July 8, 2013, ALJ Grossman held the supplemental administrative hearing.  AR 35-69.  On November 7, 2013, ALJ Grossman issued an unfavorable decision.  AR 11-34.

---

[2] Citations to "AR" refer to the certified copy of the administrative record filed by the Commissioner.  See ECF No. 10.

[3] At the commencement of the hearing, Plaintiff's counsel amended Plaintiff's disability onset date from June 21, 2010, to May 27, 2010.  AR 85, 318.

[4] The Appeals Council ordered that upon remand, the ALJ must obtain additional evidence regarding Plaintiff's impairment, give further consideration to Plaintiff's residual functional capacity ("RFC") and provide an appropriate rationale with specific references to evidence in the record to support the assessment, and obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base.  AR 133.

Thereafter, on January 8, 2014, Plaintiff filed a request for review of the ALJ's November 7, 2013, decision with the Appeals Council (AR 9-10), which was denied on May 28, 2015. AR 1-8. That denial made the ALJ's November 7, 2013, decision the final action of the Commissioner. See Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) ("If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision.").

On July 1, 2015, Plaintiff commenced the instant action in this Court, seeking judicial review of the ALJ's November 7, 2013, decision. ECF No. 1. On November 9, 2015, the Commissioner filed her answer and the administrative record. ECF Nos. 9, 10. Thereafter, on March 22, 2016, the Commissioner filed her motion for judgment on the pleadings contending that the matter should be remanded as the ALJ failed to properly weigh various medical opinions. Def.'s Motion (ECF No. 22); Def.'s Mem. (ECF No. 23). On May 25, 2016, Plaintiff filed his cross-motion for judgment on the pleadings arguing that the ALJ's November 7, 2013, decision should be reversed solely for a calculation and award of benefits. Pl.'s Motion (ECF No. 32); Pl.'s Mem. (ECF No. 33). In the alternative, Plaintiff contends that the matter should be remanded to a different ALJ in light of the ALJ's alleged hostility towards Plaintiff. Id.[5]

---

[5] Plaintiff also moves for an award of attorneys' fees pursuant to the Equal Access to Justice Act (the "EAJA"), 28 U.S.C. § 2412(d). The EAJA provides, in pertinent part, that: a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . unless the Court finds that the position of the United States was substantially justified or that special circumstances make an award unjust. 28 U.S.C. § 2412(d)(1)(A). "Therefore, in order to recover attorneys' fees, the plaintiff must be the prevailing party, and the position of the United States in the case must not be 'substantially justified.'" Altieri v. Sullivan, 754 F. Supp. 34, 36 (S.D.N.Y. 1991). The Second Circuit has held that a party who obtains a remand in a Social Security case is not a prevailing party for EAJA purposes. Id.; Marziliano v. Heckler, 728 F.2d 151, 155 (2d Cir. 1984); McGill v. Sec'y of Health and Human Servs., 712 F.2d 28, 30-32 (2d Cir. 1983), cert. denied, 465 U.S. 1068 (1984). As this is a report and recommendation, which the district judge may accept or reject, there is no prevailing party as of yet. Accordingly, Plaintiff's request for attorneys' fees is premature.

3

## B.   Relevant Medical Evidence

### 1.   New York Presbyterian Hospital

On November 16, 2009, Plaintiff presented to New York Presbyterian Hospital ("NYPH") Emergency Department with complaints of worsening lower back pain that radiated down his left leg.  AR 383-85.  Plaintiff reported that the pain "comes and goes," but became much worse while working that day.  AR 384.  Plaintiff was diagnosed with back pain, advised to follow up with his physician, and prescribed Vicodin[6] for severe pain.  AR 385.

On May 24, 2010, Plaintiff returned to NYPH with complaints of lower back pain and left leg pain, as well as nausea.  AR 388-92.

### 2.   Dr. Ramon Delmonte

On November 19, 2009, Plaintiff presented to Dr. Ramon Delmonte, his primary care physician, with complaints of lower back pain radiating into his left leg.  AR 397-98.  Dr.

---

[6] Vicodin is a United States brand of a hydrocodone and acetaminophen combination "used to relieve pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated." Drugs and Supplements:  Hydrocodone and Acetaminophen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last visited March 15, 2019).

Delmonte assessed sciatica,[7] prescribed him Nabumetone[8] and Ultracet,[9] and referred him to orthopedics.  AR 397.

On January 4, 2010, Plaintiff again presented to Dr. Delmonte with complaints of lower back pain.  AR 395-96.  Dr. Delmonte assessed abdominal pain and lower back pain and referred Plaintiff to the emergency room for further evaluation.  AR 396.

On May 26, 2010, Plaintiff presented to Dr. Delmonte with complaints of lower back pain that radiated to his left leg.  AR 393-94.  Dr. Delmonte assessed lower back pain and prescribed Meloxicam.[10]  AR 393.  He also referred Plaintiff to physical therapy.  AR 393.

---

[7] Sciatica refers to pain that radiates along the path of the sciatic nerve, which branches from the lower back through the hips and buttocks and down each leg. Typically, sciatica affects only one side of the body.  Diseases and Conditions:  Sciatica, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-20377435 (last visited March 15, 2019).

[8] Nabumetone is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat mild to moderate pain and help relieve symptoms of arthritis (osteoarthritis and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain.  Drugs and Supplements:  Nabumetone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/nabumetone-oral-route/description/drg-20069686 (last visited March 15, 2019).

[9] Ultracet is a United States brand of a tramadol and acetaminophen combination that is "used to relieve acute pain severe enough to require an opioid treatment and when other pain medicines did not work well enough or cannot be tolerated. When used together, the combination provides better pain relief than either medicine used alone."  Drugs and Supplements:  Tramadol and Acetaminophen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/tramadol-and-acetaminophen-oral-route/description/drg-20062870 (last visited March 15, 2019).

[10] Meloxicam is a NSAID used to relieve the symptoms of arthritis (juvenile rheumatoid arthritis, osteoarthritis, and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain.  Drugs and Supplements:  Meloxicam (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited March 15, 2019).

3. **Dr. Paul Hobeika**

On December 3, 2009, Plaintiff presented to Dr. Paul Hobeika, an orthopedic surgeon, with complaints of lower back pain radiating to his left leg, which, Plaintiff advised, began five to six weeks prior. AR 484. Dr. Hobeika reported that Plaintiff was taking anti-inflammatory medication and Tramadol[11] with minimal relief. AR 484. His physical examination of Plaintiff revealed that Plaintiff was "neurovascularly intact besides straight-leg raising on the left." AR 484. His reflexes were equal on both sides and there was no sign of weakness. AR 484. Dr. Hobeika opined that Plaintiff was suffering from sciatica, most likely of the disc, and "instability of the joint above the previous surgery." AR 484. Dr. Hobeika advised Plaintiff that he could not bend down, should not lift, push, or pull, and should wear a corset for approximately four weeks. AR 484. Dr. Hobeika noted that if Plaintiff did not improve, a repeat magnetic resonance imaging ("MRI") test should be performed. AR 484.

That same day, December 3, 2009, Plaintiff underwent a lumbar spine x-ray at Columbus Circle Imaging. AR 386. The radiology report indicated that there was no acute fracture or lesion. AR 386. There was straightening, significant facet arthrosis in L4-L5 and L5-S1, slight end plate indentation at T12-L1 and T11-T12, small osteophytes at L4 and L5, posterior disc space at L4-L5 that was borderline, mild scrum acutum, and sclerosis in the right sacroiliac ("SI") joint. AR 386.

---

[11] Tramadol is used to relieve moderate to moderately severe pain, including pain after surgery. The extended-release capsules or tablets are used for chronic ongoing pain. It belongs to the group of medicines called opioid analgesics and acts in the central nervous system to relieve pain. Drugs and Supplements: Tramadol (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited March 15, 2019).

### 4.    **Theradynamics Physical Rehab**

On June 1, 2010, Plaintiff underwent an initial evaluation at Theradynamics Physical Rehab. AR 446-48.  The treating clinician, Jason Mendoza, noted that Plaintiff complained of pain and difficulty with trunk-bending activities, prolonged sitting for more than twenty minutes, prolonged standing for more than ten minutes, and prolonged walking for more than one to two blocks. AR 447.  Mr. Mendoza also noted that Plaintiff ambulated with a limp due to pain in his lower back and left buttocks. AR 447.  He reported that Plaintiff had pain in his lower back which Plaintiff rated as an 8/10 when at rest and 10/10 with activity. AR 447.  Pain exacerbating factors were prolonged sitting, standing, and walking, as well as trunk-bending activities.  AR 448.  Relieving factors were lying supine, rest, and medication. AR 447.  Mr. Mendoza noted that Plaintiff had tenderness and severe muscle spasm in his lower back. AR 447.  Therapeutic exercises and manual therapeutic techniques were recommended. AR 447.  Plaintiff was advised to undergo physical therapy two to three times per week. AR 447.

Plaintiff continued physical therapy with Mr. Mendoza on June 9, 2010 (AR 449-50), June 10, 2010 (AR 451-52), and June 12, 2010. AR 453-54.

### 5.    **NYU Hospital for Joint Diseases**

On June 22, 2010, Plaintiff presented to the NYU Hospital for Joint Diseases ("NYU Hospital") with complaints of severe left leg pain for the past six months. AR 459-60.  He explained that the pain was present at all times and he was hardly able to walk one block. AR 459.  Plaintiff also noted that eight years ago he underwent disc surgery at the L4-L5 disc space. AR 459.  Dr. Per Trobisch found Plaintiff positive for "Laseque[12] [sic] on the left," and noted

---

[12] Lasègue's test or straight leg raising is usually carried out with the patient supine. A hand is held on top of the knee to keep the leg straight and the other hand is placed under the heel and used to lift the leg. The leg is raised until the patient complains of pain and the angle at which

that Plaintiff had full motor function in his bilateral lower extremity, even though it was painful. AR 459. His impression was that Plaintiff had L4-L5 root compression. AR 459. His plan was for Plaintiff to undergo an epidural at L4-L5 and to return with MRI films. AR 459.[13]

On August 27, 2010, Plaintiff returned to the NYU Hospital with complaints of worsening left lower extremity pain. AR 455-56. He reported a "constant stabbing pain radiating down his posterior thigh, lateral leg to the ankle," and also complained of back pain. AR 455. Plaintiff explained that this pain originally started in December of 2009, improved thereafter, but returned in May of 2010. AR 455. Plaintiff also reported having received two epidural injections in late July of 2010 and on August 4, 2010, which had not helped. AR 455. Dr. Sergio Glait performed a physical examination of Plaintiff, noting that Plaintiff had decreased sensation over his left lower extremity in the lateral leg and plantar foot. AR 455. Dr. Glait recommended that Plaintiff undergo physical therapy, continue his current pain control, and undergo an MRI. AR 455.

### 6.    St. Luke's-Roosevelt Hospital Center

On July 1, 2010, Plaintiff presented to the spinal clinic of St. Luke's Roosevelt Hospital Center ("St. Luke's") with complaints of left lower extremity radicular pain. AR 498. Plaintiff denied weakness and numbness. AR 498. Epidural steroid injections were recommended. AR 498.

On August 5, 2010, Plaintiff presented to the spinal clinic of St. Luke's with complaints of left radiculopathy. AR 497.

---

this occurs is noted. Any pain will not do. For the pain to be diagnostic it should be sciatic pain running down the leg and preferably into the foot. Complaints of pain elsewhere may not be significant. Medical Information System For Lawyers, Straight leg raising, § 6:166 (2d).

[13] This was Plaintiff's initial visit at NYU Hospital. Plaintiff also underwent a full medical examination at this time. See AR 459-65.

On September 20, 2010, Dr. Daveed Frazier of St. Luke's Hospital performed a minimally invasive anterior retroperitoneal L4-L5 lumbar interbody decompression and fusion with mesh cage on Plaintiff.  AR 467-71.  Dr. Frazier noted that Plaintiff presented with progressively worsening back pain radiating down his legs.  AR 469.  He indicated that he had multiple extensive conversations with Plaintiff regarding the risks and benefits of operative versus nonoperative intervention and Plaintiff chose to proceed with operative intervention.  AR 469.

Approximately ten days after surgery, on September 30, 2010, Plaintiff presented to the orthopedic clinic of St. Luke's reporting improved back pain and no radiculopathy.  AR 491.  Plaintiff was "doing well" and was taking Tylenol.  AR 491.

On October 28, 2010, Plaintiff returned to the orthopedic clinic at St. Luke's and reported that his radiculopathy symptoms were significantly better and his back pain had improved.  AR 490.  Plaintiff was ambulating with a cane and "doing well."  AR 490.

On December 9, 2010, Plaintiff again presented to the orthopedic clinic with lower back pain, which he rated as an 8/10 on the pain scale, but noted that his leg pain had improved.  AR 489.  At that time, Plaintiff was taking Tramadol and Tylenol.  AR 489.

On February 3, 2011, Plaintiff presented to the spinal clinic at St. Luke's and reported that the "radiculopathy ha[d] completely resolved," but that he continued to experience lower back pain.  AR 488.  Plaintiff was directed to undergo "aggressive physical therapy" and was referred to pain management.  AR 488.

On April 7, 2011, Plaintiff presented to the spinal clinic with continuing complaints of lower back pain.  AR 487.  Plaintiff had undergone one session of physical therapy since his last visit and he had full strength in his right lower extremities, and 4/5 or 5/5 in his left.  AR 487.

On May 5, 2011, Plaintiff complained of lower back pain that was "better when sitting or lying down but worse when standing up." AR 486. Plaintiff was taking Tylenol and Tramadol. AR 486. A physical examination showed some decreased sensation in his left foot. AR 486. Plaintiff's motor strength exam was "questionable for effort." AR 486. In his right lower extremities, Plaintiff had full strength, but in his left, he had 4/5 in strength. AR 486. The plan for Plaintiff was "aggressive physical therapy" and to return in three months. AR 486.

Three months later, on August 4, 2011, Plaintiff returned to St. Luke's spinal clinic with complaints of increased back pain over the past two months, as well as numbness in his lateral thigh. AR 485, repeated at 544. His examination revealed no neurological deficits and decreased sensation of his left lateral cutaneous femoral nerve ("LCFN"). AR 482.

On October 6, 2011, Plaintiff presented to St. Luke's spinal clinic with complaints of axial back pain. AR 543. Plaintiff's radicular symptoms had improved, but he still experienced occasional left lateral lower extremity numbness. AR 543. Plaintiff was advised to undergo a CT scan to evaluate the fusion. AR 543.

Thereafter, on November 10, 2011, Plaintiff continued to complain of lower back pain and left leg pain. AR 541. He had "very decreased" sensation in his left LCFN. AR 541. Plaintiff was advised to undergo a CT to evaluate his fusion progress, as well as an EMG to "elicit etiology of neurological findings." AR 541.

On June 7, 2012, Plaintiff returned to the spinal clinic with complaints of persistent lower back pain and radiculopathy in his left thigh and posterior leg. AR 539. This note indicated that Plaintiff's January 2012 CT scans revealed "minimal boney fusion." AR 539. Plaintiff was referred to pain management. AR 539.

On December 12, 2012, Plaintiff presented to Dr. Jung Kim of St. Luke's with complaints of chronic lower back pain that radiated to his left leg. AR 581-82. Dr. Kim noted that Plaintiff's pain interfered with his activities of daily living and ambulation. AR 581. His physical examination revealed that Plaintiff had tenderness on the right side in his SI joints, tenderness in his lumbar spine, no obvious boney abnormalities, and positive elicitation of pain with spinal flexion and straight-leg raise. AR 581-82. Dr. Kim recommended a transforaminal epidural steroid injection. AR 581.

### 7.   Dr. Casilda Balmaceda

On April 12, 2011, Plaintiff first presented to Dr. Casilda Balmaceda,[14] a neurologist, with complaints of back pain. AR 508-09, repeated at 565-66. Specifically, Plaintiff described severe pain when supine and getting up from bed and noted that his pain improved when he walked some, which Dr. Balmaceda noted as abnormal. AR 508.[15] Her physical examination of Plaintiff revealed a normal gait, full strength in his lower extremities, full range of motion, and normal bilateral lower extremity sensation. AR 508-09.[16] Dr. Balmaceda assessed lumbago[17]

---

[14] ALJ Grossman refers to Dr. Balmaceda as a "he." See AR 25 ("He also stated that the claimant must lie down five times a day for half an hour at a time.") (emphasis added). Plaintiff and Defendant refer to Dr. Balmaceda as "her" and "she." See Def.'s Mem. at 10 ("Dr. Balmaceda completed three medical source statements . . . as well as a brief letter summarizing her medical opinion.") (emphasis added); Pl.'s Mem. at 9 ("She recommended physical therapy.") (emphasis added). The Court adopts the parties' characterization of Dr. Balmaceda.

[15] This note appears in many of Dr. Balmaceda's progress notes. See, e.g., progress notes dated April 12, 2011, June 6, 2011, August 8, 2011, August 22, 2011, October 25, 2011, December 6, 2011, January 12, 2012, and March 8, 2012.

[16] The same findings were made in many other progress notes authored by Dr. Balmaceda. See, e.g., progress notes dated April 12, 2011, June 6, 2011, August 8, 2011, August 22, 2011, October 25, 2011, December 6, 2011, and January 12, 2012.

[17] Lumbago refers to back pain. Health Topics: Back Pain, MedlinePlus, https://medlineplus.gov/backpain.html (last visited March 15, 2019).

and reported that Plaintiff had severe lumbosacral pain, severe muscle spasms, and severe radiculopathy. AR 509.[18] She noted that Plaintiff was to undergo a nerve conduction study ("NCS") to determine whether he had a pinched nerve. AR 509.

On April 26, 2011, Plaintiff underwent an MRI of his lumbar spine without contrast, which showed no evidence of fracture, marrow displacement disease, spinal stenosis, or intrathecal mass. AR 564. Plaintiff's L1-2, L2-3, L3-4, and L5-S1 disc levels were normal. AR 564. At L4-L5, Plaintiff had a metallic plate and screw transfixation and disc spacer. AR 564. Additionally, at L4-L5, there was a left lateral recess disc herniation protruding approximately three millimeters and narrowing the left lateral recess. AR 564.

On June 6, 2011, Plaintiff presented to Dr. Balmaceda with complaints of back pain. AR 506-07, repeated at 567-68. She continued to recommend that Plaintiff undergo a NCS and noted that Plaintiff could consider physical therapy for minimal help. AR 507.

On August 8, 2011, Plaintiff returned to Dr. Balmaceda with continuing complaints of lower back pain. AR 569-70. Plaintiff was prescribed Codeine.[19] AR 570.

On August 22, 2011, Plaintiff again presented to Dr. Balmaceda with complaints of back pain. AR 504-05, repeated at 571-72. She recommended that Plaintiff undergo an MRI and

---

[18] The same findings were made in many other progress notes authored by Dr. Balmaceda. See, e.g., progress notes dated April 12, 2011, June 6, 2011, August 8, 2011, August 22, 2011, October 25, 2011, December 6, 2011, January 12, 2012, and March 8, 2012.

[19] Codeine is used to relieve mild to moderate pain. It belongs to the group of medicines called narcotic analgesics (pain medicines). This medicine acts on the central nervous system (CNS) to relieve pain. Drugs and Supplements: Codeine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/codeine-oral-route/description/drg-20074022 (last visited March 15, 2019).

12

NCS and noted that he could consider physical therapy for minimal help.  AR 505.  She

continued to prescribe Codeine and also prescribed Dilaudid.[20]  AR 505.

That same day, Dr. Balmaceda also completed two non-SSA forms.  The first was titled,

"Report of Treating Physician."  AR 500-02.  Her handwritten notes in this form stated that

Plaintiff had severe lumbar pain, severe back spasms, an antalgic gait, limited lumbar flexion and

extension, and poor coordination.  AR 500.  Her diagnosis was severe "failed back syndrome,"

and her prognosis was "poor."  AR 501.  Dr. Balmaceda noted that Plaintiff was required to lie

down five times per day for thirty minutes.  AR 501.  Plaintiff was taking Lyrica,[21] Tramadol,

---

[20] Dilaudid is the United States brand of hydromorphone and is used to relieve pain.
Hydromorphone belongs to the group of medicines called narcotic analgesics (pain medicines).
Drugs and Supplements:  Hydromorphone (Oral Route), Mayo Clinic,
https://www.mayoclinic.org/drugs-supplements/hydromorphone-oral-route/description/drg-
20074171 (last visited March 15, 2019).

[21] Lyrica is the United States brand of pregabalin that is "used with other medicines to help
control partial seizures (convulsions) in the treatment of epilepsy and is also used for
postherpetic neuralgia (pain that occurs after shingles) and pain caused by nerve damage from
diabetes or a spinal cord injury.  It is also used to treat fibromyalgia (muscle pain and stiffness).
Drugs and Supplements:  Pregabalin (Oral Route), Mayo Clinic,
https://www.mayoclinic.org/drugs-supplements/pregabalin-oral-route/description/drg-20067411
(last visited March 18, 2019).

Oxycodone,[22] and Percocet[23] at that time.  AR 502.[24]  The second form was titled "Physical

Capacities Evaluation."[25]  AR 503.   In this form, Dr. Balmaceda indicated that Plaintiff was

"occasionally"[26] able to lift/carry up to ten pounds and "frequently"[27] able to lift/carry up to eight

pounds.  AR 503.  She noted that Plaintiff could stand for up to two hours per day and sit less

than six hours per day.  AR 503.  Plaintiff had no upper extremity limitations, but did have lower

extremity limitations.  AR 503.  She also indicated that Plaintiff could not bend.  AR 503.[28]

On October 25, 2011, Plaintiff again presented to Dr. Balmaceda with ongoing

complaints of back pain.  AR 517-18, repeated at 573-74.

On November 3, 2011, Plaintiff underwent a NCS, which according to Dr. Balmaceda,

showed bilateral S1 radiculopathy.  AR 511-14.

---

[22] Oxycodone is used to relieve pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated. It belongs to the group of medicines called narcotic analgesics (pain medicines). Oxycodone acts on the central nervous system (CNS) to relieve pain. Drugs and Supplements:  Oxycodone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/oxycodone-oral-route/description/drg-20074193 (last visited March 18, 2019).

[23] Percocet is an oxycodone and acetaminophen combination used to relieve pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated. Drugs and Supplements:  Oxycodone and Acetaminophen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/drg-20074000 (last visited March 18, 2019).

[24] Some of Dr. Balmaceda's notes in this report are illegible and are not included here.

[25] Defendant incorrectly refers to this document as "Physician Capacities Evaluation" in her moving papers.  Def.'s Mem. of Law at 10 (emphasis added).

[26] In this report, the term "occasionally" referred to "up to 1/3 of [a] work day." AR 503.

[27] In this report, the term "frequently" referred to "1/3 to 2/3 of [a] work day." AR 503.

[28] Some of Dr. Balmaceda's notes in this report are illegible and are not included here.

On December 6, 2011, Plaintiff again presented to Dr. Balmaceda with continuing complaints of back pain. AR 519-21, repeated at 575-76. Dr. Balmaceda prescribed Lyrica and noted that Plaintiff needed to see Dr. Frazier. AR 519.

On January 12, 2012, Plaintiff returned to Dr. Balmaceda with complaints of back pain. AR 522-24, repeated at 577-78.

In a letter dated February 3, 2012, Dr. Balmaceda noted a "discrepancy" between her typewritten notes and handwritten notes regarding Plaintiff's musculoskeletal examination. AR 510. Specifically, she noted that since Plaintiff's initial visit to her, Plaintiff had an atelic gait, as opposed to a normal gait, and severely limited flexion and extension movements at the spine. AR 510. She also noted that Plaintiff had been taking high doses of Lyrica and Cyclobenzaprine[29] for pain management. AR 510. She explained that this discrepancy occurred because "by mistake, the complete [sic] set a default and printed a normal exam." AR 510.

On March 8, 2012, one month after Dr. Balmaceda became aware of the discrepancy in her medical notes (AR 510), Plaintiff again presented to Dr. Balmaceda with complaints of back pain. AR 525-27. Dr. Balmaceda reported that Plaintiff had a normal gait, full strength in his lower extremities, full range of motion, and normal bilateral lower extremity sensation. AR 526. Plaintiff was advised to "[h]old on all meds." AR 525.

On May 10, 2012, Plaintiff again presented with complaints of back pain. AR 528-29. Dr. Balmaceda again assessed lumbago and noted that Plaintiff had severe back pain and was waiting to see Dr. Frazier. AR 528. She indicated that Plaintiff was to slowly start taking Lyrica

---

[29] Cyclobenzaprine is used to help relax certain muscles in the body and helps relieve pain, stiffness, and discomfort caused by strains, sprains, or injuries to the muscles. Drugs and Supplements: Cyclobenzaprine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited March 18, 2019).

again. AR 528. Dr. Balmaceda continued to report that Plaintiff had a normal gait, full strength in his lower extremities, full range of motion, and normal bilateral lower extremity sensation. AR 529.

On June 13, 2012, Plaintiff continued to complain of back pain to Dr. Balmaceda. AR 530-32. She continued to assess that Plaintiff had lumbago and continued to report that Plaintiff had a normal gait, full strength in his lower extremities, full range of motion, and normal bilateral lower extremity sensation. AR 530, 532. These same findings appear in Dr. Balmaceda's August 22, 2012, consultation note. AR 533-35.

In a letter dated August 29, 2012, Dr. Balmaceda reported that Plaintiff had "severe chronic lumbar pain syndrome" and was operated upon by Dr. Frazier, but experienced no pain relief. AR 536. She indicated that Plaintiff's pain was severe and interfered with his daily activities and ability to work. AR 536. She further opined that she believed Plaintiff was "completely disabled having failed physical therapy, multiple analgesics and even lumbar spinal decompression and stabilization surgery." AR 536.

On September 24, 2012, Plaintiff presented to Dr. Balmaceda with complaints of back pain. AR 604-06. Dr. Balmaceda continued to assess that Plaintiff had lumbago and continued to report that Plaintiff had a normal gait, full strength in his lower extremities, full range of motion, and normal bilateral lower extremity sensation. AR 605. She noted that Plaintiff "has tolerated the [H]ydrocodone well," and continued to prescribe same. AR 605.

On November 5, 2012, Plaintiff continued to complain of back pain. AR 601-03. Dr. Balmaceda noted that Plaintiff was not tolerating the Hydrocodone well as he still experienced severe pain. AR 602. She continued to assess lumbago and her plan was for Plaintiff to undergo

an electromyogram test and NCS, as well as epidurals.  AR 602.  She continued Plaintiff on

Hydrocodone.  AR 602.

On November 10, 2012, Plaintiff underwent an electrodiagnostic study of the lower

extremities, which revealed bilateral L5-S1 lumbosacral radiculopathy due to ongoing

denervation in the L5-S1 innervated muscles in the lower extremities and related lumbar

paraspinal muscles.  AR 580.

On December 6, 2012, Plaintiff continued to complain to Dr. Balmaceda of back pain.

AR 598-600.  Dr. Balmaceda continued to assess that Plaintiff had lumbago and continued to

report that Plaintiff had a normal gait, full strength in his lower extremities, full range of motion,

and normal bilateral lower extremity sensation.  AR 599.  She prescribed Dilaudid.  AR 599.

On April 4, 2013, Dr. Balmaceda continued to assess that Plaintiff had lumbago and

reported that Plaintiff had a normal gait, full strength in his lower extremities, full range of

motion, and normal bilateral lower extremity sensation.  AR 595-97.  Dr. Balmaceda noted that

Plaintiff had "sedation to hydrocodone" and prescribed MS Contin[30] for pain, as well as

Fentanyl.[31]  AR 596.

---

[30] MS Contin is a United States brand of morphine used to relieve short-term (acute) or long-term (chronic) moderate to severe pain.  Drugs and Supplements:  Morphine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/morphine-oral-route/description/drg-20074216 (last visited March 18, 2019).

[31] Fentanyl belongs to the group of medicines called narcotic analgesics, which are medicines used to relieve pain.  Drugs and Supplements:  Fentanyl (Buccal Mucosa Route, Oromucosal Route, Sublingual Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/fentanyl-buccal-mucosa-route-oromucosal-route-sublingual-route/description/drg-20063888 (last visited March 18, 2019).

On May 3, 2013, Plaintiff again presented to Dr. Balmaceda with complaints of back pain. AR 592-94. Dr. Balmaceda's findings were similar to those on April 4, 2013. Dr. Balmaceda noted that Plaintiff's pain was better on Fentanyl. AR 593.

On June 4, 2013, Plaintiff continued to complain of back pain. AR 589-91. Plaintiff reported that he had been taking Fentanyl, had dizziness, and was also taking Tramadol. AR 589.

On June 20, 2013, Dr. Balmaceda completed another "Report of Treating Physician" (AR 583-85), wherein she noted that she had been treating Plaintiff since April 12, 2011, and that he had severe pain, spasm, ataxia, difficulty walking, severe restriction of movement, severe paraspinal spasm, poor balance, and a severe antalgic gait. AR 583. She diagnosed Plaintiff with severe chronic pain, severe failed back pain syndrome, and chronic lumbar pain. AR 584. Her prognosis for Plaintiff was "poor" and she noted that Plaintiff needed to lie down two to three times during the day. AR 584.

On June 28, 2013, Plaintiff again presented to Dr. Balmaceda with complaints of back pain. AR 586-88. She continued to assess that Plaintiff had lumbago and continued to report that Plaintiff had a normal gait, full strength in his lower extremities, full range of motion, and normal bilateral lower extremity sensation. AR 587. Dr. Balmaceda continued Plaintiff on Fentanyl. AR 587.

## C.    **Consultative Examinations**

### 1.    **Dr. Louis Tranese:  Orthopedic Examination**

On November 4, 2010, Plaintiff underwent a consultative orthopedic examination by Dr. Louis Tranese of Industrial Medicine Associates ("IMA"), P.C. AR 473-76. Plaintiff reported that in 2002 he injured his back in a motor vehicle accident. AR 473. He was diagnosed with

disc derangement in the lumbar spine and was initially treated with physical therapy and medications. AR 473. Plaintiff's back pain progressed and in 2003 he underwent lumbar spine surgery. AR 473. Following that surgery, Plaintiff experienced short-term pain improvement, but thereafter his pain worsened. AR 473. Plaintiff treated with chiropractic, epidural injections, and underwent further physical therapy. AR 473. On September 20, 2010, Plaintiff underwent a lumbar discectomy with fusion at St. Luke's. AR 473.

At the time of his consultative examination, Plaintiff complained of daily, persistent, lower back pain, which he described as a "severe, burning, crampy, achy pain which intermittently is sharp and electric-like, graded 8/10." AR 473. Plaintiff explained that the pain radiated down his left lower extremity to his knee. AR 473. He also reported that he experienced intermittent numbness and tingling of the medial aspect of his left foot extending to the first two toes. AR 473. Plaintiff also informed Dr. Tranese that when he walked or stood for a long period of time, his left lower extremity became painful, fatigued, and weak. AR 473. His back pain was also aggravated with standing and lying on his back for long periods of time. AR 473. He indicated that he was unable to bend and squat, and that his pain was moderately and temporarily relieved with prescription medications and rest. AR 473. Plaintiff noted that at that time he was taking Percocet and Tramadol. AR 474. He also reported that he was dependent on his family for cooking, cleaning, laundry, and shopping, and that he required assistance with showering and dressing. AR 474.

Dr. Tranese's examination revealed that Plaintiff did not appear to be in any acute distress. AR 474. Plaintiff's gait was abnormal. AR 474. He ambulated with decreased step, length, and stride and had difficulty walking on his heels and toes, secondary to back pain. AR 474. He was unable to squat beyond fifteen percent maximum capacity as he reported pain. AR

19

474. His station was normal. AR 474. Plaintiff used a straight cane that was prescribed by his physicians for pain. AR 474. Dr. Tranese noted that in his opinion, the cane was medically necessary for Plaintiff's reassurance, particularly when ambulating in the community. AR 474. Plaintiff's gait was unchanged when he ambulated with the cane. AR 474. Dr. Tranese noted that Plaintiff needed no help changing for the exam or getting on and off the exam table. AR 474. He was also able to rise from a chair without difficulty. AR 474.

Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally. AR 475. Plaintiff had no cervical or paracervical pain or spasm or trigger points. AR 475.

Plaintiff's thoracic and lumbar spine examinations revealed that he had multiple well-healed scars. AR 475. His spinal range of motion was not tested secondary to underlying orthopedic spine precautions. AR 475. Plaintiff had moderate spasm in the paraspinal muscles of the lumbar region. AR 475. He did not have SI joint or sciatic notch tenderness, but he did have moderate spasm in the lumbar paraspinals. AR 475. No scoliosis or kyphosis was reported. AR 475. Plaintiff had decreased lumbar lordosis in the lateral view. AR 475. Plaintiff's straight-leg raise test was negative and he had no trigger points. AR 475.

Turning to his upper extremities, Plaintiff had full range of motion of his shoulders, elbows, forearms, wrists, and fingers bilaterally. AR 475. He had no joint inflammation, effusion or instability. AR 475. He had full strength in his proximal and distal muscles and no muscle atrophy or sensory abnormality. AR 475.

Turning to Plaintiff's lower extremities, he had full range of motion in his hips, knees, and ankles bilaterally. AR 475. Plaintiff's left and right lower extremity muscle strength was full. AR 475. He reported diminished sensation to light touch over his lateral calf and diffusely

throughout his left foot in a non-focal dermatomal distribution. AR 475. He did not have joint effusion, inflammation, or instability. AR 475.

Dr. Transese's diagnosis was that Plaintiff had a "[h]istory of motor vehicle accident with back injury" and "[s]tatus post multiple lumbar surgeries including a recent lumbar discectomy with fusion." AR 476. His prognosis was "[g]uarded." AR 476. Dr. Tranese opined that Plaintiff had severe limitations in bending, squatting, kneeling, crouching, and heavy lifting. AR 476. Plaintiff had moderate to severe limitations with frequent stair-climbing, as well as moderate limitations with tolerating long-distance ambulation and standing for long periods. AR 476. Dr. Tranese opined that Plaintiff may have mild to moderate limitations with sitting long periods. AR 476. He further opined that Plaintiff had no limitations using his upper extremities for fine and gross manual activities and noted that Plaintiff had no other physical functional deficits. AR 476.

On November 15, 2010, Plaintiff presented to IMA Disability Services in Bronx, New York for a lumbosacral spine x-ray. AR 477. The interpretation of the x-ray showed a posterior fusion and disc implant at L4-L5. AR 477. There was no compression fracture. AR 477. There was a transitional L5 vertebral body. AR 477.

### 2. Dr. Marilee Mescon:  Neurologic Examination

On October 8, 2012, Dr. Marilee Mescon of IMA, P.C., performed a consultative neurologic examination of Plaintiff. AR 548-51. Dr. Mescon noted Plaintiff's history of diabetes and back pain. AR 548. Plaintiff's medications at that time were Hydrocodone,

Tramadol, Gabapentin,[32] Lyrica, Exalgo,[33] Metformin,[34] Gemfibrozil,[35] and Omeprazole.[36]  AR

549.  Plaintiff indicated that his wife cooked, cleaned, shopped, and did the laundry.  AR 549.

He reported that he showered, bathed, and dressed himself, and spent his time watching

television.  AR 549.

　　　Dr. Mescon's physical examination revealed that Plaintiff had a normal gait and station,

but had difficulty walking on his heels and toes.  AR 549.  She noted that Plaintiff used a cane

for balance at all times and that it was prescribed by a doctor.  AR 549.  She explained that the

cane was "medically necessary even though he could walk normally without [it as] he use[d] it

for reassurance."  AR 549.  Plaintiff's tandem walk heel-to-toe maneuver was abnormal and the

---

[32] Gabapentin works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system.  It is also used to help control partial seizures (convulsions) in the treatment of epilepsy.  Drugs and Supplements:  Gabapentin (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited March 18, 2019).

[33] Exalgo is the United States brand of hydromorphone and is used to relieve pain.  It belongs to the group of medicines called narcotic analgesics (pain medicines).  It acts on the central nervous system (CNS) to relieve pain.  Drugs and Supplements:  Hydromorphone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydromorphone-oral-route/description/drg-20074171 (last visited March 18, 2019).

[34] Metformin is used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type two diabetes.  Drugs and Supplements:  Metformin (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/metformin-oral-route/description/drg-20067074 (last visited March 18, 2019).

[35] Gemfibrozil is used together with a proper diet to treat high cholesterol and triglyceride (fat) levels in the blood.  Drugs and Supplements:  Gemfibrozil (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/gemfibrozil-oral-route/description/drg-20064018 (last visited March 18, 2019).

[36] Omeprazole is used to treat certain conditions where there is too much acid in the stomach.  It is used to treat gastric and duodenal ulcers, erosive esophagitis, and gastroesophageal reflux disease (GERD).  Drugs and Supplements:  Omeprazole (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/drg-20066836 (last visited March 18, 2019).

Romberg test was negative.  AR 549.  Dr. Mescon noted that at the examination, Plaintiff's wife

helped him dress and undress, but Plaintiff needed no help getting on and off the exam table.  AR

549-50.  He was able to rise from a chair without difficulty.  AR 550.

 Plaintiff had a 4/5 grip strength in his left hand and full grip strength in his right.  AR

550.  He had no loss of hand or finger dexterity in either hand.  AR 550.  Turning to his upper

extremities, Plaintiff had 4/5 motor strength in his left upper and lower arm and full motor

strength in his right upper and lower arm.  AR 550.  He had no dysmetria and no muscle atrophy.

AR 550.

 Plaintiff had normal range of motion of the cervical, thoracic, and lumbar spines.  AR

550.  He had no tenderness or muscle spasm.  AR 550.  His active straight-leg raise in the supine

position on the left was zero to twenty degrees and on the right, zero to ninety degrees.  AR 550.

Plaintiff had no trigger points.  AR 550.  Turning to his lower extremities, Plaintiff had 3/5 motor

strength in his left upper and lower leg and full motor strength in his right upper and lower leg.

AR 550.  He had no dysmetria, tremors, or muscle atrophy.  AR 550.  Plaintiff was unable to

perform the heel-to-shin testing on his left leg due to weakness and pain, but he had normal

results on his right leg.  AR 550.  Babinski reflexes were negative.  AR 550.  Plaintiff also had

diminished sensory perception over his left upper and lower leg, as well in his left upper and

lower arm.  AR 550.

 Dr. Mescon diagnosed Plaintiff with left hemiparesis,[37] left hemisensory loss,

radiculopathic back pain versus diabetic peripheral neuropathy, diabetes, and chronic back pain.

AR 551.  Her assessment of Plaintiff's long-term prognosis was "fair to poor."  AR 551.  Dr.

---

[37] Hemiparesis is partial weakness on one side of the body.  Jose Vega MD, What is Hemiparesis and What Causes It?  Verywell Health, https://www.verywellhealth.com/what-is-hemiparesis-3146197 (last visited March 18, 2019).

Mescon opined that based on her examination, Plaintiff had no limitations in his ability to sit, but his capacity to stand, climb, push, pull, or carry heavy objects was severely limited because of weakness in his left leg. AR 551.

That same day, Dr. Mescon completed a form titled, "Medical Source Statement of Ability To Do Work-Related Activities (Physical)." AR 552-58. She indicated that Plaintiff was able to lift and carry up to ten pounds occasionally. AR 552. Plaintiff was able to sit for one hour, stand for twenty minutes, and walk for one-half hour without interruption. AR 553. In an eight-hour work day, Plaintiff could sit for one hour, stand for twenty minutes, and walk for one-half hour. AR 553. She noted that Plaintiff was required to use a cane to ambulate, that it was medically necessary, and that he could only ambulate without the cane while at home. AR 553. Plaintiff had no limitations using his hands. AR 554. However, Dr. Mescon noted that Plaintiff could never use his right foot to operate foot controls and could continuously use his left foot. AR 554.[38] She opined that Plaintiff could never climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, or crawl. AR 555.

Dr. Mescon also indicated that Plaintiff could occasionally withstand exposure to unprotected heights, never be exposed to moving mechanical parts, and could not operate a motor vehicle. AR 556. She reported that Plaintiff could not do the following: shop, travel without a companion for assistance, ambulate without using an assistive device, walk one block at a reasonable pace on rough or uneven surfaces, or use standard public transportation. AR 557.

---

[38] Plaintiff notes the opposite in his papers—that Plaintiff could continuously use his right foot and never use his left. Pl.'s Mem. at 15. Given that Plaintiff's medical history continuously reports issues with radicular pain in his left leg, it is a fair assumption that Dr. Mescon merely erred in her findings. Nonetheless, Dr. Mescon's medical records speak for themselves and the undersigned and counsel cannot infer as to what Dr. Mescon may have meant.

On January 23, 2013, Dr. Mescon submitted an addendum to the SSA advising that Plaintiff could sit for three to four hours with and without interruption, but that he could not stand or walk because of weakness in his left leg.  AR 579.[39]

**D.**    **Non-Medical Evidence**

    **1.**    **Evidence from Disability Records**

        **a.**    **August 30, 2010, Reports**

On August 30, 2010, Plaintiff was interviewed by an Agency employee by the name of D. Gonzalez.  AR 330-32.  Following a face-to-face interview, Gonzalez observed that Plaintiff walked very slowly and that while sitting during the interview, he moved a lot "because [he] was complaining of pain."  AR 331.  Gonzalez reported that Plaintiff had difficulty sitting, standing, and walking.  AR 331.

In a separate disability report also dated August 30, 2010 (AR 333-41), Plaintiff noted that because of his back injury, he ceased working on June 21, 2010.  AR 334.  He reported that he worked as a landscaper in 1999 and then as a mechanic from 2000 until his disability onset date of June 21, 2010.  AR 335.  He noted that as of the date of the report, he was taking the

---

[39] At the July 3, 2013, administrative hearing, ALJ Grossman explained that he contacted Dr. Mescon to seek clarification as to an inconsistency regarding whether Plaintiff was limited in his ability to sit.  AR 40.  Plaintiff notes that while the administrative record included Dr. Mescon's addendum, it did not include the ALJ's letter to Dr. Mescon which prompted the issuance of the addendum.  Pl.'s Mem. at 16.; AR 39-40.  Plaintiff notes that while he requested a copy of that letter, it was not made part of the record.  Pl.'s Mem. at 16.

following medications for pain:  Hydrocodone with APAP, Ibuprofen, Lyrica, and Naprosyn.[40]

AR 336.[41]

### b.     Functional Report:  Activities of Daily Living

On September 17, 2010, Plaintiff completed a functional report detailing his activities of

daily living.  AR 342-48.

Plaintiff reported that at that time, he was living in an apartment with his family.  AR

342.  His daily routine consisted of waking up and trying to move slowly and sit because his

back bothered him and caused pain.  AR 342.  Plaintiff had no issues with personal care and did

not need any special help or reminders to take care of his personal needs or to take his

medication.  AR 343.  He indicated that his wife cooked and performed household chores.  AR

343-44.  Plaintiff reported that his ability to handle money was unchanged.  AR 345.  Plaintiff

only ventured outside to go to his doctor appointments.  AR 344.  He noted that he drove and

could go out alone.  AR 344.  Turning to hobbies and interests, Plaintiff watched television every

day and did not socialize.  AR 345.  He indicated that he used to attend church services, but "not

lately since [his] back and leg started to hurt."  AR 345.

Plaintiff reported that he could not lift, stand, walk, or sit for long periods of time, nor

could he kneel or squat.  AR 345-46.  Plaintiff could slowly climb stairs, reach, use his hands,

---

[40] Naprosyn is the United States brand of naproxen which is a NSAID used to relieve symptoms
of arthritis (osteoarthritis, rheumatoid arthritis, or juvenile arthritis) such as inflammation,
swelling, stiffness, and joint pain. Naproxen also helps relieve symptoms of ankylosing
spondylitis, which is a type of arthritis that affects the joints in the spine. Drugs and
Supplements:  Naproxen (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-
supplements/naproxen-oral-route/description/drg-20069820 (last visited March 18, 2019).

[41] The record also contains an undated disability report completed by D. Varcas, which contains
no remarks or information of substance relevant to rendering a decision in this matter.  AR 358-
59.

see, hear, and talk. AR 345-46. He noted that he could walk for approximately thirty minutes

before he had to stop and rest for fifteen to twenty minutes. AR 346.

Plaintiff first started experiencing pain that affected his activities of daily living in May

of 2010. AR 347. He described the pain as "a big pinch on [his] back and leg" that he

experienced daily. AR 347, 348. Plaintiff's pain began in his lower back and radiated to his left

leg. AR 347. In addition to taking medication, Plaintiff noted that he used a back-support belt.

AR 348.

### c.     Work History Report

On September 17, 2010, Plaintiff also completed a work history report. AR 349-56. In

that report, he noted his employment from 1999 onwards. AR 349. His most recent employment

was working as a mechanic at D&J Truck Repair, Inc. from 2007 to 2009. AR 349. In that

position, he worked nine to ten hours per day, six days per week. AR 354. He used machines,

tools, and equipment, as well as technical knowledge and skills. AR 354. Plaintiff spent nine

hours walking, standing, and handling objects. AR 354. He sometimes sat, climbed, stooped,

knelt, crouched, and crawled. AR 354. He noted that the heaviest weight he lifted was 100

pounds and that he frequently lifted 50 pounds. AR 354.

### d.     Physical RFC Assessment

On November 24, 2010, K. Jones of the SSA completed a physical RFC assessment of

Plaintiff. AR 478-83. Based on Plaintiff's medical records, K. Jones found that Plaintiff could

occasionally and frequently lift and/or carry a maximum of ten pounds, stand and/or walk with

normal breaks for a total of at least two hours in an eight-hour work day, sit for about six hours

in an eight-hour work day, and was unlimited in his ability to push and/or pull. AR 479.

Plaintiff was occasionally limited in his ability to climb a ramp/stairs, balance, stoop, kneel,

crouch, and crawl. AR 480. Plaintiff had no manipulative, visual, or communicative limitations. AR 480-81. He also had no environmental limitations except to avoid concentrated exposure to hazards, such as machinery or heights. AR 481.

K. Jones concluded that Plaintiff had a medically determinable impairment which could reasonably be expected to cause some limitations in performing work-related physical activities, but not to the degree Plaintiff alleged. AR 482. He went on to explain that Plaintiff reported performing activities of daily living, that his wife performed household chores, and that Plaintiff spent his day watching television and could walk about thirty minutes before stopping and resting. AR 482. Plaintiff also reported pain in his lower back and left leg, and that he was taking Lyrica, Ibuprofen, Naproxen, Nabumetone, Tramadol, Nexium, and Vicodin for pain. AR 482. K. Jones also noted that Plaintiff had not reported using a cane on his activities of daily living form, but was using a cane during his consultative examination. AR 482. He also noted that the medical evidence in Plaintiff's file did not indicate that a cane had been prescribed and while Plaintiff reported taking multiple medications for pain on the activities of daily living form, during his consultative examination he reported only taking Percocet and Tramadol. AR 482. K. Jones concluded that given the objective medical findings and Plaintiff's reported daily activities, "it is not credible that [Plaintiff's] symptoms have been of such intensity, frequency or duration as to preclude all work activity." AR 482.

### e.      Undated Report-Appeal

On December 29, 2010, Plaintiff also completed an undated "Disability Report-Appeal" form. AR 360-65. Plaintiff noted that since his last disability report, he underwent back surgery on September 20, 2010, and was experiencing more pain. AR 360. He also noted that since his last disability report, he could not lift anything heavy, bend, or twist around. AR 360. He

28

reported that he had a hard time taking care of his personal needs, such as showering. AR 364. He explained that he needed to ask for help in doing things he normally would do himself and had to be very careful in everything he did as he feared falling. AR 364. Plaintiff also listed his medical providers. AR 361-63.

### 2.   Plaintiff's Administrative Hearings

#### a.   Plaintiff's September 7, 2011, Administrative Hearing

Plaintiff appeared at the September 7, 2011, hearing accompanied by counsel. AR 80-106. ALJ Rodriguez-Quilichini conducted the hearing. AR 82. Dr. Jerman Malaret, a medical expert, and Dr. Hector Puig, a vocational expert, were also present. AR 82.

Dr. Malaret testified that Plaintiff had significant lumbar disc degenerative disease due to a motor vehicle accident. AR 86. He noted that Plaintiff underwent a microdiscectomy in 2003 and thereafter returned to work. AR 86. In 2009, Plaintiff developed pain again and in 2010, he underwent a lumbar fusion and discectomy from which he "apparently recovered, but [] started having low[er] back pain again." AR 86. Dr. Malaret then noted that the results of Plaintiff's December 3, 2009, orthopedic examination "found everything fairly well, except he might have had sciatica down the left lower extremity." AR 86. Plaintiff attended physical therapy and by August 4, 2011, his radiculopathy subsided, but he still experienced lower back pain. AR 86. Dr. Malaret noted Dr. Balmaceda's findings that Plaintiff had exertional limitations and could stand for approximately three to four hours, stand less than two hours, sit less than six hours and was limited in his ability to bend, stoop, crawl, and crouch. AR 86-87. Dr. Malaret also noted that Plaintiff's orthopedic consultation found that Plaintiff had limitations only upon prolonged

standing and walking. AR 87. Dr. Malaret noted that Plaintiff must avoid scaffolds and high ladders, but that he otherwise had limitations that would be in the light category. AR 87.[42]

Plaintiff testified that he lived with his wife and children. AR 94. He completed high school and had lived in the United States for the past twelve years. AR 96. He testified that he had worked as an auto mechanic for D&J Auto Repair. AR 96.

Plaintiff further testified that his wife performed household activities, such as cooking, cleaning, and shopping. AR 94-95. Plaintiff had a driver's license and stopped driving in 2010 because he could not sit in the same position. AR 95. He testified that he ate once or twice per day and did not have much of an appetite. AR 97. For exercise, Plaintiff tried to walk a little. AR 97. He stated that his friends visited him "[s]ometimes once a week." AR 98. Plaintiff testified that during the day he spent his time watching television. AR 97. He went to bed at 7:00 p.m. or 8:00 p.m. and sometimes awoke two or three times during the night. AR 98. He stated that he did not feel rested when he awoke. AR 98.

Plaintiff testified that he stopped working on May 27, 2010, due to pain in his back and left leg. AR 91. He had surgery, which improved the pain in his leg "a little," but he still experienced pain in his back. AR 93. He testified that he took Percocet for the pain, but experienced drowsiness and nausea when taking it. AR 93-94. Plaintiff noted that Dr. Balmeceda advised him to lie down four to five times per day. AR 94. He testified that he could sit for ten or fifteen minutes and then had to stand. AR 94. He further testified that he could stand for thirty or forty minutes and walk three to four blocks before he had to stop for ten or fifteen minutes. AR 94. He rated his pain as a seven or eight out of ten. AR 94.

---

[42] Dr. Malaret was then questioned by Plaintiff's counsel. See AR 88-90.

Dr. Hector Puig, a vocational expert, then testified.  Dr. Puig stated that Plaintiff

originally worked as a landscape gardener (Department of Occupational Titles ("DOT")

406.684-018, medium, SVP[43]: 4).  AR 99.  Plaintiff also worked as an assistant auto mechanic

(DOT 620.261-030, medium, SVP: 5).  AR 99.  Dr. Puig testified that a person with Plaintiff's

medical profile and limitations would not be capable of performing Plaintiff's past relevant

work.  AR 100.  Dr. Puig explained that Plaintiff's previous jobs were in the medium category

and the hypothetical led him to believe that the individual was "most syntonic with light [work]."

AR 100.

Dr. Puig further testified that an individual with Plaintiff's age, education, and work

experience, who was able to lift up to twenty pounds occasionally and lift and carry up to ten

pounds frequently, who could push and pull the same amount of weight, stand and walk for

about three hours in an eight-hour work day, unable to climb ladders or scaffolds, but could

climb stairs stoop, kneel, crouch, and crawl only occasionally, and who used a cane while

occasionally walking and standing could perform other jobs in the national or regional economy.

AR 100.  Specifically, Dr. Puig noted that an individual with these limitations could be a sorter

or classifier (DOT 789.687-146, light, SVP: 2).  AR 100.  An individual could also identify final

---

[43] "SVP," or specific vocational preparation, refers to the amount of time required for a typical claimant to learn the techniques, acquire the information, and develop the facility needed for average performance in a job.  See Specific Vocational Preparation (SVP), Social Security Administration, https://secure.ssa.gov/poms.nsf/lnx/0425005015#d (last visited March 18, 2019). SVP ratings are used as a guideline for determining how long it would take a claimant to achieve average performance in a job as part of the Commissioner's evaluation of whether the claimant's past work is relevant.  Id.  The Commissioner considers a claimant's education when evaluating whether the claimant performed a job long enough to learn it.  Id.

products or perform picketing (DOT 229.587-018, light), or be an order clerk (DOT 209.567-014, sedentary,[44] SVP: 2).  AR 101.

Dr. Puig then testified that if that same individual could lift up to ten pounds, stand and walk about two hours in an eight-hour work day, sit for up to six hours in an eight-hour workday, push and pull the same amount of weight in pounds, had the same postural limitations noted previously, used a cane, and also needed to change or shift positions between sitting and standing at will to stretch out voluntarily, and then sit back, this individual could perform sedentary work and work as an order clerk, as well as an office support worker (DOT 209.582-018, sedentary, unskilled, SVP: 2).  AR 102-03.

Dr. Puig then testified that an individual who took pain medication who experienced side effects such as drowsiness, which frequently affected his ability to function, would not be able to perform any of the foregoing jobs noted.  AR 103.  Dr. Puig testified that poorness of attention and concentration would prohibit an individual from satisfying consistent quality standards and he or she would not be able to perform any kind of job present in the economy.  AR 103.

Dr. Puig testified that if this hypothetical individual took unscheduled breaks during an eight-hour workday, as often as four to five times per day for fifteen minutes, he or she would not satisfy employment standards and would not be able to satisfy any kind of employment in any business.  AR 103-04.

---

[44] The regulations define "sedentary work" as work that involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(a).

Dr. Puig testified that if this individual also suffered severe pain and as a result of this severe pain, was unable to sustain sufficient concentration, persistence, or pace to complete simple, routine tasks on a regular and continuing basis eight hours per day, five days per week, he or she would not be able to do any kind of work on a sustained basis present in the economy. AR 104.

### b.       Plaintiff's September 4, 2012, Administrative Hearing

On September 4, 2012, Plaintiff appeared with counsel for another administrative hearing.  AR 70-79.[45]  ALJ Grossman presided over this hearing.  AR 70.

Plaintiff testified that he was 44 years old at the time of the hearing, completed high school in the Dominican Republic, and came to the United States at the age of 31 or 32.  AR 74. He testified that he last worked in May of 2010 as a mechanic.  AR 75.  He stated that he could not perform a "desk job" because he was unable to sit for more than fifteen minutes.  AR 75-76.

ALJ Grossman stated that he was going to send Plaintiff for a neurological examination and then hold a supplemental hearing with an orthopedic medical examiner and a vocational expert present.  AR 77.

---

[45] ALJ Grossman noted that upon remand, the Appeals Council required a vocational expert to be present at the hearing.  However, at the time of the hearing a vocational expert was not present. AR 72.  ALJ Seth Grossman explained that he had not scheduled a vocational expert because he did not think it was efficient to have a vocational expert present until he knew he had "all the records."  AR 77.

### c.  Plaintiff's July 8, 2013, Administrative Hearing

On July 8, 2013, Plaintiff, accompanied by counsel, appeared at the supplemental administrative hearing before ALJ Grossman.  AR 35-69.  Raymond Cestar,[46] a vocational expert, and Dr. Robert Kendrick,[47] a medical expert, were also present.  AR 35.

Plaintiff testified that at the time of the hearing he was 45 years old.  AR 41.  He was born in the Dominican Republic and graduated high school there.  AR 41.  In 2000, he came to the United States.  AR 42.  He became a United States citizen about six years ago by passing a test written in English and comprised of both written and oral questions.  AR 41, 42.  He testified that he could carry on small conversations in English, but did not read or write much in English.  AR 41-42.  Plaintiff further testified that he last worked as a mechanic for D&J Truck Repair in May of 2010.  AR 42.  As a mechanic he changed gasoline and repaired motors.  AR 43.  He noted that he did limited reading in English and did not read manuals while working as a mechanic.  AR 43.  Plaintiff explained that his boss would tell him what he had to do.  AR 43.

Plaintiff testified that he had "a lot of pain" in his back, underwent two surgeries, and noted that his doctor suggested that he might have to undergo another surgery.  AR 44.  He stated that when he went somewhere most of the time he had to be accompanied by another person because his left leg was weak and numb.  AR 44.  Plaintiff testified that he could sit comfortably for fifteen minutes before he had to stand up and walk around a little.  AR 45.  He could stand for about twenty minutes and walk for about two blocks before he had to stop.  AR 45.  He could

---

[46] The administrative hearing transcript refers to the vocational expert as Raymond "Cester."  AR 35.  ALJ Grossman refers to him as Mr. "Cestar."  AR 17.  The Court adopts the ALJ's spelling of the vocational expert's name for purposes of this decision.

[47] The administrative hearing transcript and Defendant refer to the medical expert as Dr. "Kendrid."  AR 35; Def.'s Mem. at 14-15.  ALJ Grossman and Plaintiff refer to him as Dr. "Kendrick."  AR 17.  The Court adopts the latter spelling for purposes of this decision.

not carry more than five pounds. AR 46. He noted that his doctor suggested that he lie down every two hours. AR 48.

Plaintiff testified that he lived with his wife who helped him get dressed because he could not bend and had no strength in his legs. AR 47. His wife also cooked, cleaned, and shopped. AR 46, 47. Plaintiff went on to state that he typically spent his day, sitting, standing up, and lying down three to four times per day. AR 47. He reported that he arrived at the hearing by taking a cab and that was how he typically traveled to his monthly doctor appointments. AR 46.

Dr. Kendrick, the medical expert, testified that Plaintiff had "a bad back," and in technical terms, Plaintiff had lumbar spondylosis. AR 49. He testified that the record review and Dr. Balmaceda's notes were "boiler plate." AR 54.[48] He stated that Plaintiff had basically a normal neurological examination, but was also described as being severely handicapped by pain manifestations from his underlying degenerative spinal condition to the point that it prevented him from working. AR 55. Dr. Kendrick testified that Plaintiff's functional capacity was sedentary due to pain and that Plaintiff should only be able to perform sedentary work on the days that his pain was not severe. AR 55. He also testified that he had no basis to refute Dr. Balmaceda's opinions. AR 55. Dr. Kendrick opined that Plaintiff did not meet or equal a listing because Plaintiff had no neurological changes. AR 56. He also stated that there was no indication in any of the treating records that Plaintiff used a cane. AR 59. Dr. Kendrick opined that "if someone walked in my office and had a cane, that would be noted immediately" and

---

[48] Dr. Kendrick stated the following: "Well, the record review, and Dr. Balmsita's notes, which all read about the way you have described to me the last once [sic], it seems like almost all of the notes in the record were as Counsel has pointed out are [sic] boiler plate. You know if these are electronic notes that are stored, you push a button, you get the same record, which you would assume that the findings as indicated by the boiler plate would be accurate and true, otherwise they wouldn't be you know recording that. They'd be modifying that record." AR 54-55.

explained that it was "an important finding." AR 59.  Dr. Kendrick also noted that there was no evidence that Plaintiff had muscle atrophy in his left leg.  AR 62-63.

Mr. Cestar, the vocational expert, then testified.  He noted that Plaintiff's past relevant work was that of a truck mechanic (DOT 620.261-010, medium, SVP: 7).  AR 66.  He stated that a person capable of performing the full range of sedentary work but who was limited to lifting five pounds could perform the jobs of a surveillance system monitor (DOT 379.367-010, sedentary, unskilled, SVP: 2), order clerk (DOT 209.567-014, sedentary, unskilled, SVP: 2), assembler (DO 706.684-030, sedentary, unskilled, SVP: 2), or weight tester (DOT 539.485-010, sedentary, unskilled, SVP: 2).  AR 67.  Mr. Cestar testified that assuming that Plaintiff was less than sedentary there would be no jobs available for Plaintiff.  AR 68.

Upon inquiry by the ALJ, Mr. Cestar testified that an individual could perform the job of a truck mechanic even if he or she could not read English and no manuals in Spanish existed because he or she could obtain assistance from someone who could interpret the manuals.  AR 66.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Standard of Review

The scope of review in an appeal from a social security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standards.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 106

(internal quotation marks and citations omitted).  When determining whether substantial

evidence supports the Commissioner's decision, it is important that the court "carefully

consider[] the whole record, examining evidence from both sides." Tejada, 167 F.3d at 774

(citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a

reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198

F.3d 45, 52 (2d Cir. 1999) (citation omitted).  As such, if the "decision rests on adequate findings

supported by evidence having rational probative force, [the court] will not substitute [its own]

judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

**B.    Determining Disability**

The Social Security Act (the "Act") defines the term "disability" as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months." 42 U.S.C. §

423(d)(1)(A).  One is disabled under the relevant statute if he or she suffers from an impairment

which is "of such severity that he [or she] is not only unable to do his [or her] work but cannot . .

. engage in any other kind of substantial gainful work which exists in the national economy." 42

U.S.C. § 423 (d)(2)(A).  "[W]ork which exists in the national economy means work which exists

in significant numbers either in the region where such an individual lives or in several regions of

the country." Id.

Regulations issued pursuant to the Act set forth a five-step process to aid the

Commissioner in determining whether a particular claimant is disabled.  The Commissioner first

considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§

37

404.1520(a)(4)(i),(b), 416.920(a)(4)(i),(b).  If the claimant is so engaged, then the Commissioner

will find that the claimant is not disabled; if the opposite is true, then the Commissioner proceeds

to the second step.  20 C.F.R. §§ 404.1520(a)(4)(i),(b), 416.920(a)(4)(i),(b).  At step two, the

Commissioner determines the medical severity of the claimant's impairments.  20 C.F.R. §§

404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A severe impairment is "any impairment or combination of

impairments which significantly limits [the claimant's] physical or mental ability to do basic

work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant suffers from any severe

impairment, the Commissioner, now at step three, must decide if the impairment meets or equals

a listed impairment; listed impairments are presumed severe enough to render one disabled, and

the criteria for each listing is found in Appendix 1 to Part 404, Subpart P of the Social Security

Regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii),(d), 416.920(a)(4)(iii),(d).

If the claimant's impairments do not satisfy the criteria of a listing at step three, the

Commissioner must then determine the claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).

A claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations."

20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  At the fourth step, the Commissioner determines

whether the claimant can perform his or her past relevant work.  20 C.F.R. §§

404.1520(a)(4)(iv),(e)-(f), 416.920(a)(4)(iv),(e)-(f).   If the claimant cannot perform his or her

past relevant work, the Commissioner considers the claimant's RFC, age, education, and work

experience to determine whether he or she can make an adjustment to other work.  20 C.F.R. §§

404.1520(a)(4)(v),(g), 416.920(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis.  DeChirico

v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citations omitted).  If the ALJ concludes at an

early step of the analysis that the claimant is not disabled, he or she need not proceed with the

remaining steps.  <u>Williams v. Apfel</u>, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is

necessary, the burden shifts to the Commissioner to show that the claimant is capable of other

work.  <u>DeChirico</u>, 134 F.3d at 1180 (citation omitted).

## III.   <u>DISCUSSION</u>

Presently before the undersigned are the parties' motions for judgment on the pleadings.

ECF Nos. 22, 32.  Both parties agree that the case should be remanded but disagree as to the

scope of the remand.  Defendant argues that remand of the action for further administrative

proceedings is warranted because the ALJ failed to provide sufficient reasons for assigning

limited weight to the opinions of Dr. Balmaceda and did not fully explain his "analysis" of Dr.

Tranese's opinion.  Def.'s Mem. at 18-20.  In response, Plaintiff cross-moves for judgment on

the pleadings, contending that the Commissioner's decision should be reversed and remanded for

the sole purpose of calculating an award of benefits owed to Plaintiff, or, in the alternative, that

the action be remanded to a different ALJ in light of ALJ Grossman's alleged hostility towards

Plaintiff.  Pl.'s Mem. at 17-25.

### A.   <u>The ALJ's Decision</u>

On November 7, 2013, ALJ Grossman determined that Plaintiff was not disabled as of

June 21, 2010.  AR 20.[49]  The ALJ first found that Plaintiff had not engaged in substantial

gainful activity since June 21, 2010.  AR 20.  At step two, the ALJ found that Plaintiff had the

following severe impairments: status post-lumbar discectomy and lumbar fusion.  AR 20.  At

---

[49] Plaintiff had previously amended his disability onset date to May 27, 2010, during the
administrative hearing, which should have been reflected in the ALJ's decision.  <u>See</u> AR 85, 318.

step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. AR 20.[50]

The ALJ then proceeded to determine Plaintiff's RFC. AR 21-26. ALJ Grossman concluded that Plaintiff had the RFC to perform the full range of sedentary work. AR 21.[51] Applying the correct two-step analysis described in the regulations, the ALJ first found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. AR 24. However, at the next step, the ALJ found that Plaintiff's statements

---

[50] ALJ Grossman considered listing 1.04A, which establishes the severity criteria for spine disorders that result in compromise of a nerve root or the spinal cord. AR 20. According to the ALJ, in order to meet the severity criteria, "the record must contain evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." AR 20.

ALJ Grossman explained that Plaintiff presented with back pain in May of 2010, and on June 22, 2010, an MRI showed nerve root compression. AR 20. On September 20, 2010, Plaintiff underwent spinal decompression and fusion surgery and MRIs taken after the surgery were all negative for spinal cord or nerve root compression. AR 20. ALJ Grossman went on to state that because Plaintiff's nerve root compression existed for only three months after Plaintiff's onset date, he could not find that Plaintiff's spinal impairment met a listing. AR 20. He also noted that Plaintiff's straight-leg raise tests since the surgery have been negative, and this finding was supported by Dr. Kendrick who testified that Plaintiff did not have the requisite neurologic changes necessary to meet a listing. AR 20-21.

[51] Before undergoing the RFC analysis, the ALJ acknowledged that he was required to follow the two-step process to first determine whether there existed an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms and then evaluate the intensity, persistence and limiting effects of Plaintiff's symptoms to determine the extent to which they limit Plaintiff's functioning. AR 21. The ALJ stated that whenever statements about the intensity, persistence, or functionally limiting effects of pain or other systems are not substantiated by objective medical evidence, he must make a finding on the credibility of the statements based on consideration of the entire case record. AR 21.

regarding the limiting effects of his impairments were not entirely credible.  AR 24; see 20

C.F.R. §§ 404.1529, 416.929.

The ALJ explained that he believed Plaintiff was reasonably limited to performing

sedentary work based on Plaintiff undergoing two spinal surgeries.  AR 24.  He went on to state

that after Plaintiff's second surgery, Plaintiff showed signs of left leg weakness and some loss of

sensation, which "understandably limit[ed] his ability to stand, walk, and lift objects weighing

more than 10 pounds."  AR 24.  ALJ Grossman also noted that this was "consistent with

[Plaintiff's] statements in the record that he had back pain [that was] 'better with sitting.'"  AR

24.  ALJ Grossman stated that he did not find a basis for further limiting Plaintiff's capacity to

perform the basic physical demands of work.  AR 24.  He explained that the records from St.

Luke's did not indicate that Plaintiff's back surgery failed and a post-surgery MRI showed

improvement and no evidence of stenosis.  AR 24.  Plaintiff's straight-leg raise was negative and

no further surgeries were indicated.  AR 24.  ALJ Grossman also considered Dr. Balmaceda's

notes which indicated that Plaintiff had success with pain medication as Plaintiff was prescribed

Lyrica for more than one year.  AR 24.

ALJ Grossman also found it significant that in his consultative examination with Dr.

Mescon, Plaintiff had a full range of motion in his lumbar spine and a normal gait with and

without a cane.  AR 24.  Dr. Balmaceda's notes, which span two years, consistently described

Plaintiff's gait as normal and indicated no abnormal neurological findings.  AR 24.  The ALJ

then acknowledged the letter from Dr. Balmaceda wherein she stated that her "printer set a

default and erroneously printed normal examination findings" and explained that at all times,

Plaintiff's gait was atelic.  AR 24.  The ALJ stated that he found it "incredible that this supposed

mistake spanned every office visit note over the course of two years, and that Dr. Balmaceda

never saw fit to make note of an abnormal gait in the narrative portion of any of the visit notes." AR 24. The ALJ noted that Plaintiff treated at St. Luke's spinal clinic contemporaneously and "not once did the examining physicians make note of an abnormal gait." AR 24.

The ALJ further stated that there was evidence that Plaintiff was "exaggerating his symptoms," because Plaintiff appeared with a cane at his two consultative examinations and at the hearing, but there was no indication in any of the voluminous treatment records that a cane was prescribed or that he appeared at an examination with one. AR 25.[52] Additionally, Dr. Kendrick testified that if Plaintiff was not walking normally there would "absolutely" be atrophy in Plaintiff's leg muscles, but Dr. Kendrick found no such evidence. AR 25. The ALJ noted that on May 5, 2011, a medical entry reported that Plaintiff was "questionable for effort" in performing a motor strength exam. AR 25. The ALJ also noted that "aggressive" physical therapy was prescribed following Plaintiff's September 2010 surgery, but that Plaintiff attended only one session, which indicated that Plaintiff's "symptoms were not as troublesome as he [had] alleged in connection with his application." AR 25. Lastly, the ALJ noted that he found Plaintiff's "purported inability to read and write English [to be] incredible, given the fact that he took and passed the United States citizenship test in English." AR 25. ALJ Grossman also noted that Mr. Cestar testified that Plaintiff was a truck mechanic, which was a skilled job, and it was unlikely that a person would be able to secure employment in such a job on the condition that instruction manuals would have to be translated by other employees. AR 25.

---

[52] After reviewing the evidence in the administrative record, the undersigned notes that Plaintiff was "ambulating with cane" at his October 28, 2010, visit to the orthopedic clinic at St. Luke's. AR 490. Thus, the ALJ is not correct that there is "no" indication anywhere else in the record that Plaintiff appeared with a cane. Notwithstanding, the undersigned does note that beyond this single entry, there does not appear to be evidence that Plaintiff did appear with a cane at any of his medical visits.

The ALJ next assessed the medical opinion evidence. The ALJ assigned limited weight to Dr. Balmaceda's opinions that Plaintiff must sit for less than six hours per day and lie down five times per day for at least one-half hour. AR 25. ALJ Grossman explained that these opinions were not supported by objective evidence or Plaintiff's reports to his treating physicians indicating that his pain was relieved by sitting. AR 25. There was also no mention in Dr. Balmaceda's office visit notes that frequently lying down was required for pain relief or that it was medically initiated. The ALJ also afforded little weight to Dr. Balmaceda's August 29, 2012, letter opining that Plaintiff's pain interfered with his daily activities and ability to work, and that Plaintiff was completely disabled. AR 25. The ALJ explained that Dr. Balmaceda's treatment notes did not indicate significant findings as there was no objective evidence of decompensation from Plaintiff's August 22, 2011, physical capacity evaluation through August 29, 2012, the date of the letter. AR 25. Additionally, ALJ Grossman concluded that the evidence showed that Plaintiff never followed through with the prescribed physical therapy following his surgery and St. Luke's treatment notes did not indicate that his surgery failed. AR 25-26.

ALJ Grossman afforded the opinion of consultative examiner, Dr. Tranese, "good weight" because his opinions were consistent with his examination findings, which included negative straight-leg raise tests bilaterally. AR 26.

ALJ Grossman assigned no weight to Dr. Mescon's opinions because her three functional capacity assessments contradicted each other. AR 26. Specifically, ALJ Grossman explained that in her October 8, 2012, report, Dr. Mescon opined that Plaintiff had no limitations in sitting, but his ability to stand, climb, push, pull, and carry heavy objects would be severely limited. AR 26. In her medical source statement, Dr. Mescon indicated that Plaintiff could sit for only one

hour during an eight-hour work day and could not ambulate without an assistive device, despite Plaintiff presenting to her using a cane and her indication that Plaintiff could walk normally without a cane. AR 26. Dr. Mescon's addendum to her January 23, 2013, report wherein she opined that Plaintiff could not stand or walk was baseless and detracted from the legitimacy of her previous opinions because she had observed that Plaintiff was able to stand and walk. AR 26.

At the fourth step in the sequential analysis, the ALJ found that Plaintiff was unable to perform his past relevant work as a truck mechanic, which required a medium level of exertional activity. AR 27. At the fifth step, the ALJ took into account Plaintiff's age (at age 42 on his alleged disability onset date, he was a "younger individual"), education (he had at least a high school education and was able to communicate in English), work experience, and RFC, in conjunction with the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpt. P, App. 2. AR 27-28. The ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform. AR 28. Accordingly, the ALJ decided that Plaintiff was not under a disability within the meaning of the Act from June 21, 2010, the alleged onset date, through November 7, 2013, the date of the decision. AR 28.

### B.    Defendant's Arguments

The undersigned first addresses Defendant's arguments. Defendant contends that remand is warranted because the ALJ did not provide sufficient reasons for assigning limited weight to the opinion of Dr. Balmaceda, nor did the ALJ fully explain his "analysis" of Dr. Tranese's opinion. Def.'s Mem. at 18-20.

1.    **Evaluation of Medical Opinion Evidence**

As a general matter, an ALJ is directed to consider "every medical opinion" in the record, regardless of its source.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Yet not every medical opinion is assigned the same weight.  Under the Social Security regulations, the opinions of a treating source as to the nature and severity of a claimant's impairments are generally, but not always, entitled to "more weight" relative to those from other treatment providers.  See id. at §§ 404.1527(c)(2), 416.927(c)(2); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).  Such opinions are given controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 700 (2d Cir. 2013).  Conversely, these opinions "need not be given controlling weight where they are contradicted by other substantial evidence in the record."  Veino, 312 F.3d at 588.

In the event that a treating physician's opinion is not given controlling weight, the ALJ must still consider various factors to determine the appropriate amount of deference to assign it. These factors include: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (ii) the extent to which the medical source provides relevant evidence to support an opinion; (iv) the extent to which the opinion is consistent with the record as a whole; (v) whether the opinion is given by a specialist; and (vi) other factors which may be brought to the attention of the ALJ.  20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).  The ALJ need not provide a "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."  Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013).  Nonetheless, the Commissioner "will always give

good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant]'s treating source's opinion." Id. at §§ 404.1527(d)(2), 416.927(c)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Certain findings, however, such as whether a claimant is disabled and cannot work, are reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

### a.    Dr. Balmaceda's Opinions

On August 22, 2011, Dr. Balmaceda completed a non-SSA form titled "Physical Capacities Evaluation." AR 503. In this form, Dr. Balmaceda reported that Plaintiff was able to lift and carry up to eight pounds frequently and up to ten pounds occasionally, stand and or/walk up to two hours per day, and sit less than six hours per day. AR 25, 503. That same day, Dr. Balmaceda completed a "Report of Treating Physician" listing her clinical findings of spasm, antalgic gait, limited lumbar flexion and extension (degree illegible), poor coordination, and an "abnormal" symptom which is also illegible, and noted that Plaintiff must lie down five times per day for thirty minutes. AR 25, 500-02. In addressing the foregoing opinion, the ALJ stated,

> I accept the lifting, carrying, and standing, limitations as generally consistent with the listed clinical signs, the [Plaintiff's] surgery, and the other residual signs post-surgery (weakness, loss of sensation). The portions of the opinion that pertain to sitting and lying down are not supported by objective evidence or [Plaintiff's] reports to his treating physicians throughout the record (indicating that pain was relieved by sitting). There is no mention in Dr. Balmaceda's office visit notes that frequently lying down was required for pain relief or that it was medically indicated. Therefore, Dr. Balmaceda's opinion was given limited weight.

AR 25. Here, the ALJ explained that Dr. Balmaceda's findings regarding Plaintiff's limitations in sitting and lying down were not consistent with her own treatment notes, nor were these opinions consistent with the record as a whole, which was proper. See Green v. Colvin, No. 15-

CV-6190L, 2016 WL 6493462, at *2 (W.D.N.Y. Nov. 2, 2016) ("I concur with the ALJ's observation that Ms. Yanda and Dr. Wittig's RFC reports are unsupported and inconsistent with the medical evidence of record, in that they describe an extent of limitation far beyond what is indicated in plaintiff's treatment notes or elsewhere in the record, or that would be reasonably expected to flow from plaintiff's diagnoses."). In fact, the ALJ is correct that no other medical source opined that Plaintiff should lie down frequently during the day for pain relief. Additionally, evidence in the record supports the ALJ's finding that Dr. Balmaceda's opinion regarding Plaintiff's sitting limitations was not supported by objective evidence. Specifically, on November 4, 2010, Dr. Tranese opined that Plaintiff may have mild to moderate limitations with sitting long periods. AR 476. On November 24, 2010, K. Jones of the SSA found that Plaintiff could sit for about six hours in an eight-hour work day. AR 479. On May 5, 2011, Plaintiff complained of lower back pain that was "better when sitting or lying down but worse when standing up." AR 486. Accordingly, in light of the evidence the ALJ's decision to afford this opinion only limited weight was proper.

ALJ Grossman then addressed Dr. Balmaceda's August 29, 2012, letter wherein Dr. Balmaceda reported that Plaintiff had "severe chronic lumbar pain syndrome" and was operated upon by Dr. Frazier, but experienced no pain relief. AR 536. In that letter, Dr. Balmaceda opined that Plaintiff's pain was severe and interfered with his daily activities and ability to work. AR 536. She further opined that she believed Plaintiff was "completely disabled having failed physical therapy, multiple analgesics and even lumbar spinal decompression and stabilization surgery." AR 536.[53] In addressing this letter, the ALJ explained that,

---

[53] The undersigned notes that it is well-settled that an opinion that a claimant is disabled is an opinion reserved for the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); see, e.g.,

> I have given this letter little weight.   Again, <u>Dr. Balmaceda's</u>
> <u>treatment notes do not indicate significant findings.</u>   The notes
> consist of documentation of subjective complaints and plans for
> medication renewals.      There is no objective evidence of
> decompensation from the time of the August 22, 2011 physical
> capacity evaluation and this letter. The evidence does not show that
> [Plaintiff] followed through with prescribed physical therapy after
> the surgery and the treatment notes of the spine specialists at St.
> Luke's do not indicate that surgery failed.

AR 26 (emphasis added).

Defendant takes issue with the ALJ's finding that Dr. Balmaceda's treatment records

contained no significant findings.  Specifically, Defendant notes that in her February 3, 2012,

letter, Dr. Balmaceda explained that there was a discrepancy between her typewritten notes and

handwritten notes regarding Plaintiff's musculoskeletal examination.  AR 510.  Specifically, Dr.

Balmaceda stated that since his first visit, Plaintiff presented with an atelic gait as opposed to a

normal gait, and that he did have severely limited flexion and extension movements at the spine.

AR 510.  The ALJ considered this letter and noted in his decision that he found it "incredible that

this supposed mistake spanned every office visit note over the course of two years and that Dr.

Balmaceda never saw fit to make note of an abnormal gait in the narrative portion in any of the

visit notes."  AR 24.

Defendant first argues that the ALJ was required to contact Dr. Balmaceda for

clarification to resolve questions about her progress notes.  Def.'s Mem. at 18.  It is true that "if a

physician's report is believed to be insufficiently explained, lacking in support, or inconsistent

with the physician's other reports, the ALJ must seek clarification and additional information

from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion."

---

Snell, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot
itself be determinative.").

Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010); Duncan v. Astrue, 09-CV-4462 (KAM), 2011 WL 1748549, at * 20 (E.D.N.Y. May 6, 2011) ("[I]f an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor."); Cabassa v. Astrue, No. 11-CV-1449 (KAM), 2012 WL 2202951, at *10 (E.D.N.Y. June 13, 2012) (same).  It is also true that an ALJ may reject a treating physician's medical opinion when it is contrary to the physician's own treatment notes.  Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8 (2d Cir. 2017) ("The ALJ did not impermissibly substitute [her] own expertise or view of the medical proof for the treating physician's opinion.  Rather, the ALJ rejected [the treating physician's] opinion because she found it was contrary to his own treatment notes.") (internal quotation marks and citation omitted); see Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013) ("Because [the treating physician's] medical source statement conflicted with his own treatment notes, the ALJ was not required to afford his opinion controlling weight.").

In this case, the ALJ was presented with two years of treatment notes from Dr. Balmaceda, as well as various medical source statements, and a letter dated February 3, 2012, wherein Dr. Balmaceda acknowledged a discrepancy in her medical records.  Upon learning that this discrepancy existed, the ALJ should have contacted Dr. Balmaceda to obtain information to resolve the discrepancy.  As Dr. Balmaceda noted in her February 3, 2012, letter, there existed handwritten notes that accurately reflected her findings, yet ALJ Grossman failed to request these documents before discrediting her February 3, 2012, letter.  These handwritten notes may have shed light on the veracity of this, as ALJ Grossman characterizes, "supposed mistake."  AR 24.  Additionally, while the ALJ noted that "Dr. Balmaceda never saw fit to make a note of an

49

abnormal gait in the narrative portion in any of the visit notes" (AR 24), Dr. Balmaceda did hand write that Plaintiff had an antalgic gait in her August 22, 2011, report, which further supports Dr. Balmaceda's position that a discrepancy in Plaintiff's treatment records may have existed.  AR 500.

Yet instead of inquiring further, the ALJ, relying on what can only be characterized as "gut instinct" or speculation, determined that he found this discrepancy "incredible" (AR 24), and branded Dr. Balmaceda's two years of treatment notes as devoid of "significant findings." AR 25.  This reasoning, without more, is not sufficient.  It is well-settled that "the ALJ cannot arbitrarily substitute his [or her] own judgment for competent medical opinion . . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he [or she] is not free to set his [or her] own expertise against that of a physician who [submitted an opinion to or] testified before him [or her]."  McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983) (internal quotation marks and citations omitted).

Additionally, the undersigned addresses an issue not raised by either party.  On February 3, 2012, Dr. Balmaceda became aware of this discrepancy and explained what her findings would have been, but for the computer error, i.e., that Plaintiff had an atelic gait and severely limited flexion and extension movements at the spine.  However, after that date, Dr. Balmaceda's notes continued to report that Plaintiff had a normal gait, full strength in his lower extremities, full range of motion, and normal bilateral lower extremity sensation.  See, e.g., AR 525-27, 528-29, 530-32, 604-06.  No further explanation from Dr. Balmaceda followed as to why her treatment notes after February 3, 2012, continued to report normal findings and thus, the ALJ should have sought clarification.

Accordingly, the undersigned concludes, and respectfully recommends that Your Honor should conclude that, upon remand, the ALJ should seek additional information as to the foregoing discrepancy relating to Dr. Balmaceda's treatment notes and should fully articulate his reasons for the weight assigned to her opinions.

### c.   Dr. Tranese's Opinions

Defendant next contends that remand is appropriate in light of the ALJ's analysis of the opinions of consultative examiner, Dr. Tranese, for three reasons.  First, Defendant argues that although ALJ Grossman assigned Dr. Tranese's opinion "good" weight, "it is unclear whether the opinion supports the ALJ's RFC for the full range of sedentary work" as Dr. Transese expressed his opinion using imprecise language, stating that Plaintiff had a "mild to 'moderate' limitation with sitting for long periods." Def.'s Mem. at 19.   Second, Dr. Tranese identified other significant limitations which were not included in the RFC or addressed by the ALJ.  Def.'s Mem. at 19-20.  Lastly, Defendant contends that the ALJ needed to explain how Dr. Tranese's positive findings of significant functional limitations were consistent with Plaintiff's RFC. Def.'s Mem. at 20.

The undersigned addresses Defendant's first argument regarding the "imprecise language" used by Dr. Tranese.  Defendant cites to Curry v. Apfel, 209 F.3d 117 (2d Cir. 2000) in support of her position that because Dr. Tranese used "imprecise" language, it is unclear whether his opinion supports the RFC finding.  In Curry, the Second Circuit found that the only evidence that supported the ALJ's conclusion that plaintiff retained the RFC to perform the exertional requirements of at least sedentary work was plaintiff's consultative examiner's opinion that plaintiff's impairment was "[l]ifting and carrying moderate; standing and walking, pushing and pulling and sitting mild." Id. at 123.  The Court explained that,

51

> [w]hile the opinions of treating or consulting physicians need not be
> reduced to any particular formula, [the consultative examiner's]
> opinion [was] so vague as to render it useless in evaluating whether
> [plaintiff] can perform sedentary work. In particular, [his] use of the
> terms 'moderate' and 'mild,' <u>without additional information</u>, does
> not permit the ALJ . . . to make the necessary inference that
> [plaintiff] can perform the exertional requirements of sedentary
> work.

<u>Id.</u> (emphasis added). In this case, Dr. Tranese opined that Plaintiff had severe limitations in bending, squatting, kneeling, crouching, and heavy lifting; moderate to severe limitations with <u>frequent</u> stair climbing, as well as moderate limitations with tolerating <u>long-distance</u> ambulation and standing for <u>long periods</u>; and mild to moderate limitations with sitting <u>long periods</u>. AR 476 (emphasis added). In <u>Curry</u>, there was no temporal descriptor as to how long Plaintiff could perform various activities. While Defendant argues that inclusion of the temporal time frame of a "long period" is still sufficiently vague (Def.'s Mem. at 19), the Court does not agree. The undersigned finds that Dr. Tranese's opinions were not "so vague as to render [them] useless" in evaluating whether Plaintiff could perform sedentary work and that his opinions contained sufficient "additional information" not present in <u>Curry</u>. 209 F.3d at 123.

Defendant next contends that the ALJ was required to explain why he rejected Dr. Tranese's opinions that Plaintiff was severely limited in his ability to bend, squat, kneel, crouch, and perform heavy lifting, that he was moderately to severely limited in climbing stairs frequently, and moderately limited in long-distance ambulation and standing for long periods. Def.'s Mem. at 19-20. First, the Court does not agree with Defendant's argument that ALJ Grossman "rejected" the foregoing opinions. In fact, those precise opinions are mentioned at page 26 of the ALJ's decision, to which ALJ Grossman noted that he assigned "good weight." The ALJ did not state that he only assigned "good weight" to a portion of Dr. Tranese's opinion.

Lastly, Defendant argues that the ALJ was required to explain how various "positive findings" of "significant functional limitations" were consistent with the ALJ's RFC finding. Def.'s Mem. at 20.  The regulations do not require an ALJ to marshal or refer to every piece of evidence in his or her decision and explain whether he or she accepted or rejected same. Although an ALJ's RFC determination "must be set forth with sufficient specificity to enable [a court] to decide whether the determination is supported by substantial evidence," Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984), "[w]hen, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that [the ALJ] mention[ ] every item of testimony presented to him [or her] or . . . explain[ ] why he [or she] considered particular evidence unpersuasive or insufficient to lead him [or her] to a conclusion of disability." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983).  Here, contrary to Defendant's assertion, the ALJ explained why he assigned "good weight" to Dr. Tranese's opinion as he found Dr. Tranese's ultimate conclusions and the entirety of his examination findings consistent.

In this case, after reviewing the entire record, the undersigned concludes, and respectfully recommends that Your Honor should conclude, that the ALJ's assessment of Dr. Tranese's opinion was proper.

In her reply brief ("Def.'s Reply"), Defendant further contends that remand for the calculation of benefits is not proper and that "the evidence of record contains numerous reasons justifying a remand for additional proceedings."  Def.'s Reply at 2.  Specifically, Defendant contends that Dr. Kendrick's testimony supports the ALJ's decision (Def.'s Reply at 2-3), the ALJ's decision was not supported by Dr. Balmaceda's treatment notes (Def.'s Reply at 3-4), Plaintiff's reliance on Dr. Mescon's October 2012 opinion was misplaced (Def.'s Reply at 4-5),

Dr. Tranese's opinions require further evaluation (Def.'s Reply at 5-6), and Plaintiff's use of pain medications does not compel a finding of disability.  Def.'s Reply at 6.

Addressing Defendant's first argument, it is evident that the parties each interpreted the testimony of Dr. Kendrick differently.  In his decision, ALJ Grossman noted that Dr. Kendrick considered Dr. Balmaceda's reports that found Plaintiff to be "severely handicapped by pain manifestations."  AR 26.  Although Dr. Kendrick also noted that he had no basis to refute the opinions of Dr. Balmaceda (AR 26), the ALJ did.  The ALJ emphasized that he disagreed with Dr. Kendrick on this point because, inter alia, medical records showed that Plaintiff "likely could perform sedentary work."  AR 26-27; see supra at 35-36 (discussing Dr. Kendrick's testimony).  As previously discussed, ALJ Grossman found no significant findings in Dr. Balmaceda's records and concluded that her records revealed that Plaintiff had "normal neurological examinations," despite her February 3, 2012, letter to the contrary.  AR 56.  Thus, the ALJ should re-examine Dr. Kendrick's opinions after re-assessing Dr. Balmaceda's findings.  Moreover, the ALJ erred in not explicitly stating what weight he afforded Dr. Kendrick's opinions.  See, e.g., Davila v. Comm'r of Soc. Sec., No. 17-CV-6013 (JGK), 2019 WL 1244661, at *10 (S.D.N.Y. Mar. 18, 2019) (explaining that the ALJ's decision to assign the greatest weight to the opinion of the medical expert was reversible error); Bullock v. Colvin, No. 17-CV-5657 (LGS), 2019 WL 967341, at *3 (S.D.N.Y. Feb. 28, 2019) (analyzing whether ALJ's assignment of "great weight" to non-treating physician's opinion was proper).  Upon remand, the ALJ should fully articulate the weight assigned to Dr. Kendrick's opinions and how those opinions factored into his analysis.

Defendant's arguments relating to Dr. Balmaceda's treatment notes (Def.'s Reply at 3-4) and Dr. Tranese's opinions (Def.'s Reply at 5-6) have already been addressed. See supra at 46-53.

Turning to Dr. Mescon's opinions, the ALJ obtained information clarifying the inconsistencies he found in her three functional capacity assessments, which was proper and in accordance with the rule that "if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." Correale-Englehart, 687 F. Supp. 2d at 428. Specifically, Dr. Mescon's addendum noted that Plaintiff was unable to stand or walk. AR 579. ALJ Grossman found the opinions in this addendum to be "baseless" and explained that this opinion detracted from the legitimacy of her previous opinions. AR 26. Thereafter, the ALJ noted that he gave none of Dr. Mescon's opinions any weight. It is unclear why the ALJ assigned no weight to any of Dr. Mescon's opinions in light of Dr. Mescon's addendum. Upon remand, the ALJ should clarify the weight he is assigning to each of Dr. Mescon's opinions and should provide a meaningful analysis as to why he is discrediting any of her opinions.

The undersigned also finds that the ALJ properly considered Plaintiff's pain medications in rendering a decision. See infra at 57-58.

Accordingly, the undersigned concludes and and respectfully recommends that the matter be remanded for further administrative proceedings consistent with this report and recommendation.

### C.     Plaintiff's Arguments

Plaintiff seeks reversal of ALJ Grossman's November 7, 2013, decision, with remand for the sole purpose of calculating an award of benefits owed to Plaintiff, or, in the alternative, seeks remand to a different ALJ in light of alleged hostility towards Plaintiff. ECF No. 32. As the Second Circuit has explained, reversal for calculation of benefits is appropriate only when there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision . . . ." Rosa, 168 F.3d at 83. Because the Court has already recommended that the matter be remanded for further administrative proceedings, the Court will not address Plaintiff's arguments regarding remand for the sole purpose of calculating benefits. The Court will address Plaintiff's arguments that remand to another ALJ is warranted.

Although the selection of a new ALJ on remand is considered to be within the discretion of the Commissioner, Hartnett v. Apfel, 21 F. Supp. 2d 217, 222 (E.D.N.Y. 1998), 20 C.F.R. § 404.940 provides that "an administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party . . . ." In such a situation, district courts in the Second Circuit have directed the Commissioner to remand the case to a different ALJ. See, e.g., Kolodnay v. Schweiker, 680 F.2d 878, 880 (2d Cir. 1982) (remanding to a different ALJ because the original ALJ had failed to adequately consider the medical evidence); De Mota v. Berryhill, No. 15-CV-6855 (PED), 2017 WL 1134771, at *10 (S.D.N.Y. March 24, 2017) (remanding to another ALJ where ALJ was hostile and failed to adequately consider medical evidence); Sutherland v. Barnhart, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (remanding to a different ALJ appropriate "when the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process"); Ocasio v. Barnhart, No. 00-CV-6277 (SJ), 2002 WL 485691 (E.D.N.Y. Mar. 28, 2002) (remanding to a new ALJ because of animosity between the

ALJ and claimant's attorney, as well as the ALJ's lack of sensitivity); Hartnett, 21 F. Supp. 2d

217, 222 (E.D.N.Y. 1998) (remanding to a new ALJ appropriate where the ALJ made insensitive

comments to Plaintiff and mischaracterized and misunderstood the evidence).  These courts have

considered the following factors to determine whether to direct the Commissioner to remand to a

different ALJ: (1) a clear indication that the ALJ will not apply the appropriate legal standard on

remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly

apparent refusal to consider portions of the testimony or evidence favorable to a party, due to

apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due

to apparent hostility to any party.  De Mota, 2017 WL 1134771, at *10 (citing Sutherland, 322 F.

Supp. 2d at 292).

      First, Plaintiff contends that "ALJ Grossman fought the collective and unambiguous

opinions of the physicians before him, each of whom opined that [Plaintiff] was limited to less

than sedentary work" and "failed to acknowledge the vast array of pain medications used to

attempt to abate the chronic lumbar and left leg pain that every physical [sic] agreed was real and

debilitating" and that there was no reason "for such outright hostility towards [Plaintiff's] case."

Pl.'s Mem. at 22.  In this case, ALJ Grossman considered each medical opinion and concluded

that Plaintiff's medically determinable impairments could reasonably be expected to cause

Plaintiff's alleged symptoms, but that his statements regarding the limiting effects of his

impairments were not entirely credible and found that Plaintiff could perform sedentary work.

AR 24.  In reaching this conclusion, contrary to Plaintiff's assertion, the ALJ did include an

extensive and detailed discussion of Plaintiff's medical evidence, which included MRI results,

treatment records, consultative examination reports, medical opinion evidence, and Plaintiff's

own testimony, as well as how he evaluated such evidence in determining Plaintiff's RFC.  See

AR 21-27. While Plaintiff may ultimately disagree with the ALJ's conclusions regarding the physicians' opinion evidence, the undersigned does not find that the ALJ demonstrated hostility or bias that warrants remand to another ALJ.

Additionally, and again contrary to Plaintiff's assertion, the ALJ extensively considered and discussed Plaintiff's medications, noting the following in his decision:  (1) In September of 2010, Plaintiff was taking Lyrica and Nabutone daily and Ibuprofen and Naproxen as needed, but that these medications provided relief for only one hour at a time; (2) On August 27, 2010, Plaintiff reported no relief from an epidural steroid injection; (3) On May 5, 2011, Plaintiff stated that he was taking pain medication occasionally; (4) On December 6, 2011, Dr. Balmaceda renewed Plaintiff's Lyrica prescription, which began in June of 2011, and noted that occasionally Plaintiff had no pain; (5) On January 12, 2012, Dr. Balmaceda renewed Plaintiff's Lyrica prescription; (6) On March 8, 2012, Dr. Balmaceda advised Plaintiff to stop all medication because Plaintiff experienced hives of unknown origin; (7) On May 10, 2012,  Plaintiff reported that his pain had returned because he was not taking Lyrica; (8) In September of 2012, Dr. Balmaceda added Hydrocodone to Plaintiff's medication regimen; (9) On November 5, 2012, Dr. Balmaceda renewed Plaintiff's Hydrocodone prescription; (10) On December 6, 2012, Dr. Balmaceda changed Plaintiff's medication regimen due to Plaintiff's report of sedation with Hydrocodone; (11) On May 3, 2013, Dr. Balmaceda reported that Plaintiff's pain was much better on Fentanyl; and (12) On June 28, 2013, Plaintiff advised Dr. Balmaceda that his pain was better on Fentanyl and his prescription was renewed.  AR 21-27.  While Plaintiff may disagree with the ALJ's ultimate interpretation and conclusions as it relates to Plaintiff's medications, ALJ Grossman certainly discussed the type, dosage, effectiveness, and side effects of the

medications taken by Plaintiff. The undersigned does not find that remand to another ALJ is warranted on this basis either.

Second, Plaintiff asserts that the ALJ "completely and unfairly mischaracterized [Plaintiff's] statements regarding his limited English proficiency" and "discredited [his] overall credibility" based on this. Pl.'s Mem. at 23-24. ALJ Grossman stated the following in his decision:

> I also find that the claimant's inability to read and write English is incredible, given the fact that he took and passed the United States citizenship test in English, as per his testimony. The claimant also performed the job of truck mechanic in the United States for 10 years. The vocational expert testified that this is a skilled job and that it was unlikely that a person would be able to secure employment in such a job on the condition that instruction manuals would have to be translated by other employees.

AR 25. At the July 8, 2013, administrative hearing, Plaintiff testified that he became a United States citizen after passing a test written in English and comprised of both written and oral questions, carried on small conversation in English, but did not read or write much in English, and worked as a mechanic where he did limited reading in English. AR 41-43. Plaintiff also noted that while working as a mechanic, he did not read manuals as his boss would tell him what to do. AR 43. The ALJ's findings accurately reflected Plaintiff's hearing testimony. Moreover, the ALJ did not discredit Plaintiff's credibility solely on this ground. The ALJ articulated other reasons for finding Plaintiff less than credible. See supra at 42. The Court cannot agree with Plaintiff that the ALJ's finding on this point warrants remand to another ALJ.

Plaintiff next argues that the ALJ demonstrated "unfairness" to Plaintiff when he had ex parte communications with Dr. Mescon. Pl.'s Mem. at 24. Specifically, Plaintiff argues that the ALJ's inquiry of Dr. Mescon regarding her consultative opinion, which generated an addendum from Dr. Mescon, was not included in the record. Id. At the July 8, 2013, administrative

hearing, the ALJ readily admitted that he had inquired of Dr. Mescon because her medical source statement from October of 2012 indicated that Plaintiff had no limitations in his ability to sit, but in another report authored the same day, Dr. Mescon opined that Plaintiff was able to sit for one hour in an eight-hour work day, which were inconsistent findings. AR 40, 551, 553. "[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." Correale-Englehart, 687 F. Supp. 2d at 428 (emphasis added). Accordingly, the ALJ acted appropriately in contacting Dr. Mescon. While the ALJ's inquiry should have been made part of the record, the undersigned cannot find that this warrants remand to another ALJ. See Mercer v. Birchman, 700 F.2d 828, 835 (2d Cir. 1983) ("It has never been expected that an organization so vast as the [SSA] can achieve absolute procedural perfection."). Nonetheless, upon remand, the ALJ should make his inquiry of Dr. Mescon part of the administrative record.

Lastly, Plaintiff contends that the ALJ unnecessarily delayed Plaintiff's case by not calling a vocational expert to testify at the September 4, 2012, hearing, which was mandated by the Appeals Council. Pl.'s Mem. at 24. As Defendant correctly notes, ALJ Grossman explained at the September 4, 2012, hearing that he had not scheduled a vocational expert because he did not think it was efficient to have the vocational expert present until all records were submitted. AR 77. He then stated that he was sending Plaintiff to undergo a neurological examination and would thereafter hold a supplemental hearing with an orthopedic medical examiner and vocational expert present. AR 77. On October 8, 2012, Plaintiff underwent the neurological consultative examination with Dr. Mescon. In accordance with the Appeals Council's Order, a vocational expert, Mr. Cestar, was present at the July 8, 2013, hearing. On the basis of these

facts, the undersigned does not find that this matter was "unnecessarily delayed" and thus, remand to another ALJ is not warranted.

Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that remand to another ALJ is not warranted.

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude that the Commissioner's motion (ECF No. 22) be **GRANTED**, and Plaintiff's motion (ECF No. 32) be **DENIED**, and the case be remanded to the Agency for further proceedings consistent with this Report and Recommendation and pursuant to sentence four of 42 U.S.C. § 405(g).

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of Court with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

Dated: April 12, 2019
     White Plains, New York

SO ORDERED,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York